No. 18-20669

# UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

_____

PULSE NETWORK, L.L.C.,

*Plaintiff-Appellant*,

v.

VISA, INCORPORATED,

*Defendant-Appellee*.

_____

On Appeal from the United States District Court
for the Southern District of Texas (Hughes, J.)
No. 4:14-cv-3391

_____

## REDACTED OPENING BRIEF FOR PLAINTIFF-APPELLANT PULSE NETWORK, L.L.C.

_____

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
MICHAEL D. LIEBERMAN
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
(202) 879-5000
paul.clement@kirkland.com

*Counsel for Plaintiff-Appellant*

January 30, 2019

**CERTIFICATE OF INTERESTED PERSONS**

*Pulse Network, LLC v. Visa, Incorporated*, No. 18-20669

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

1.      Pulse Network, LLC

2.      Discover Financial Services, Inc.

3.      Visa, Incorporated

4.      Counsel for Pulse Network, LLC: Kirkland & Ellis LLP (Paul D. Clement, Erin E. Murphy, Michael D. Lieberman, William H. Pratt, Anne M. Sidrys, Michael S. Becker); Beck Redden, LLP (David J. Beck, Geoff A. Gannaway, Russell S. Post); Selendy & Gay, PLLC (Jennifer M. Selendy)

5.      Counsel for Visa, Incorporated: Gibson, Dunn & Crutcher LLP (Allyson Ho, Andrew Tulumello, Jacob Spencer); Kwun Bhansali Lazarus, LLP (Asim M. Bhansali); Smyser Kaplan & Veselka, LLP. (Lee Landa Kaplan); Keker, Van Nest & Peters, LLP (John Watkins Keker); Arnold & Porter Kaye Scholer, LLP (Mark R. Merley, Michael Adam Rubin)

s/Paul D. Clement
Paul D. Clement
 *Counsel of Record*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
(202) 879-5000
paul.clement @kirkland.com

*Counsel for Plaintiff-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument and believes that oral argument would assist the Court in resolving this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................... iii

TABLE OF AUTHORITIES ................................................................................ vi

STATEMENT OF JURISDICTION ....................................................................... 1

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF THE ISSUES ........................................................................... 4

STATEMENT OF THE CASE ............................................................................... 4

    A.    The Mechanics of Debit Card Networks ........................................ 4

    B.    Signature Debit Networks and PIN Debit Networks ....................... 7

    C.    Visa's Acquisition of a Debit Card Network Services Monopoly ....................................................................................... 9

    D.    Pulse's Growth and Threat To Visa's Debit Monopoly ................... 11

    E.    The Durbin Amendment ............................................................... 13

    F.    Visa's Anti-Competitive Response ............................................... 15

    G.    Proceedings Below ....................................................................... 19

STANDARD OF REVIEW ................................................................................. 27

SUMMARY OF THE ARGUMENT .................................................................... 27

ARGUMENT ..................................................................................................... 29

I.    Pulse Has Antitrust Standing ...................................................................... 29

    A.    Pulse Has Suffered Injury-In-Fact ................................................ 30

    B.    Pulse Has Suffered Antitrust Injury .............................................. 36

    C.    Pulse Is a Proper Plaintiff ............................................................. 47

II.    The District Court's Legal Errors, Mismanagement Of The Case,
       And Hostility Toward Pulse Necessitate Reassignment On Remand .......... 50

       A.    The District Court Repeatedly Attacked Pulse's Case,
             Embraced Visa's Defenses, and Criticized Settled Antitrust
             Principles ............................................................................................ 51

       B.    Reassignment Is Necessary To Preserve the Appearance of
             Justice ................................................................................................ 54

       C.    Reassignment Would Preserve Resources and Ensure
             Fairness.............................................................................................. 55

CONCLUSION ................................................................................................. 57

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Andrx Pharm., Inc. v. Biovail Corp. Int'l,*
256 F.3d 799 (D.C. Cir. 2001) ..........................................................49

*Associated Gen. Contractors of Cal., Inc.*
*v. Cal. State Council of Carpenters,*
459 U.S. 519 (1983)..........................................................................35

*Blue Shield of Va. v. McCready,*
457 U.S. 465 (1982)............................................................ 30, 47, 49

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977)................................................................... 37, 38

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.,*
123 F.3d 301 (5th Cir. 1997) ................................................. *passim*

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
504 U.S. 451 (1992)..........................................................................40

*Energy Mgmt. Corp. v. City of Shreveport,*
397 F.3d 297 (5th Cir. 2005)...........................................................30

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC,*
711 F.3d 68 (2d Cir. 2013) ..............................................................37

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.,*
466 F.3d 961 (11th Cir. 2006) .........................................................47

*Hayes v. Solomon,*
597 F.2d 958 (5th Cir. 1979) ...........................................................34

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
No. 14-md-1720 (E.D.N.Y.) .............................................................23

*In re Visa Check/MasterMoney Antitrust Litig.,*
2003 WL 1712568 (E.D.N.Y. April 1, 2003)............................. 10, 42

*Int'l Bus. Machs. Corp. v. United States,*
298 U.S. 131 (1936).........................................................................21

*Jewel v. Nat'l Sec. Agency*,
  673 F.3d 902 (9th Cir. 2011). ..............................................................32

*Johnson v. Sawyer*,
  120 F.3d 1307 (5th Cir. 1997) ............................................................50

*Kariuki v. Tarango*,
  709 F.3d 495 (5th Cir. 2013) ..............................................................27

*Latiolais v. Cravins*,
  574 F. App'x 429 (5th Cir. 2014) ................................................ 52, 56

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*,
  334 U.S. 219 (1948) ............................................................................47

*Mata v. Johnson*,
  210 F.3d 324 (5th Cir. 2000) ..............................................................52

*McCormack v. Nat'l Collegiate Athletic Ass'n*,
  845 F.2d 1338 (5th Cir. 1988) ..................................................... 30, 48

*Midland Telecasting Co. v. Midessa Television Co.*,
  617 F.2d 1141 (5th Cir. 1980) ............................................................30

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ..........................................................................7

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ............................................................................29

*Sanger Ins. Agency v. HUB Int'l*,
  802 F.3d 732 (5th Cir. 2015) ..............................................................33

*Simon v. City of Clute*,
  825 F.2d 940 (5th Cir. 1987) ....................................................... 51, 52

*Standard Oil Co. of N.J. v. United States*,
  221 U.S. 1 (1911) ................................................................................21

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) ............................................................................46

*U.S. ex rel. Little v. Shell Expl., Prod. Co.*,
602 F. App'x 959 (5th Cir. 2015).............................................................. *passim*

*United States v. Microsoft Corp.*,
56 F.3d 1448 (D.C. Cir. 1995) ..........................................................39

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ............................................................54

*United States v. Visa U.S.A. Inc.*,
344 F.3d 229 (2d Cir. 2003) .............................................................10

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) .............................................................37

**Statutes**

12 C.F.R. §235.5 ...............................................................................13

12 C.F.R. §235.7 ...............................................................................13

15 U.S.C. §15.....................................................................................29

15 U.S.C. §1693o-2............................................................................13

28 U.S.C. §1291 ..................................................................................1

28 U.S.C. §1331 ..................................................................................1

28 U.S.C. §2106..................................................................................50

**Rule & Regulation**

Fed. R. Civ. P. 56...............................................................................27

59 Fed. Reg. 42845-02 (Aug. 19, 1994) .................................................39

**Other Authority**

Areeda & Hovenkamp, Antitrust Law (4th ed.).................................... 26, 28, 37, 49

## STATEMENT OF JURISDICTION

The district court (Hughes, J.) entered final judgment in favor of defendant-appellee Visa on August 31, 2018. Plaintiff-appellant Pulse filed a notice of appeal on September 28, 2018. The district court had jurisdiction under 28 U.S.C. §1331; this Court has jurisdiction under 28 U.S.C. §1291.

## PRELIMINARY STATEMENT

This case involves a classic antitrust violation. Visa is a monopolist in a market in which Pulse competes. Pulse alleges that Visa has adopted exclusionary practices to foreclose competitors from the marketplace, reduce competition, and raise prices. Visa does not dispute that its conduct harmed Pulse, or that Pulse, as one of Visa's competitors, is an appropriate party to bring these antitrust claims. Instead, Visa disputes primarily whether Pulse has suffered "antitrust injury"—*i.e.*, whether its injury-in-fact flows from the anti-competitive aspects of Visa's conduct. But Visa disputed Pulse's antitrust injury largely by insisting that its conduct was not actually anti-competitive, and it is well settled in this Circuit (and several others) that courts must "assum[e] an antitrust violation" when assessing antitrust standing. *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 306 (5th Cir. 1997). At this stage, then, this should have been an easy case, as there can be no serious dispute that Pulse has antitrust standing to press its claims that a monopolist has tried to exclude it from the marketplace.

The district court, however, had other ideas. After spending four years deriding not just Pulse's claims, but antitrust plaintiffs generally, and even antitrust law itself, the court issued a seven-page, meandering opinion with few citations to relevant legal authority or record evidence that concluded that Pulse not only has suffered no antitrust injury, but has not even suffered the injury-in-fact that Visa never disputed. Indeed, the court even went so far as to conclude that Pulse is not a proper antitrust plaintiff because of its status as a *competitor* of Visa's, rather than a purchaser forced to pay Visa's monopolist prices—an obviously incorrect argument that, once again, Visa (wisely) did not make. The court made no effort to reconcile these remarkable conclusions with the governing law; instead, they appear to be based solely on the court's profoundly mistaken view that Visa's conduct was in fact *pro*-competitive. That is wrong as a matter of law and fact, but in all events is beside the point right now, both because the district court foreclosed merits discovery and because the *antitrust standing* inquiry must assume that an antitrust violation has occurred, and focus solely on whether the plaintiff's injuries are attributable to that alleged violation. *Id.*

That the district court reached these untenable results is unsurprising, as the court made clear from day one that it disfavors antitrust law, distrusts antitrust plaintiffs, and had no intention of allowing Pulse a meaningful opportunity to prosecute its case. Indeed, the court openly announced that it does not believe that

there is such a thing as a monopoly (unless it is supported by the government), calling the granddaddy of monopolists, pre-break-up Standard Oil, a "so-called monopolist" and insisting that seminal Supreme Court antitrust cases were "decided wrongly." This hostility to antitrust law and plaintiffs pervaded the meager and intermittent proceedings the court conducted, as evidenced by its repeated on-the-record comments disparaging Pulse's claims, antitrust law, and antitrust plaintiffs; the excessive delays that prevented this four-year-old case from advancing past the threshold issue of standing; the court's refusal to allow Pulse to obtain any meaningful discovery from Visa; and the court's deeply flawed opinion holding that Pulse lacks antitrust standing.

The decision below should be reversed; that much is clear. The only remaining question is whether this case should return to the same district court that has allowed Visa to continue its anti-competitive practices with impunity while wasting four years of the parties' time, made inexcusable errors of law, and plainly prejudged the merits, or should be re-assigned to a district court that will efficiently and fairly guide this case to a final resolution. The best way to ensure that these serious antitrust claims receive their proper day in court is to reassign this case on remand. But at a minimum, this Court should reverse and remand with instructions to allow Pulse to obtain the meaningful discovery necessary to adjudicate its claims.

## STATEMENT OF THE ISSUES

1.      Whether Pulse has antitrust standing to pursue antitrust claims against Visa, its direct competitor.

2.      Whether the district court's legal errors, mishandling of the case, and demonstrated hostility toward antitrust law and antitrust plaintiffs warrant reassignment on remand.

## STATEMENT OF THE CASE

### A.   The Mechanics of Debit Card Networks

The most common types of payment cards in the United States are credit cards and debit cards.  A credit card allows a cardholder to make purchases without immediately accessing funds in a checking account; instead, the cardholder accrues debt and then pays back the credit card company later.  ROA.4730-31.  A debit card, in contrast, allows a cardholder to make purchases that are immediately (or almost immediately) deducted from the cardholder's checking account.  ROA.4730-31.

This case involves debit cards, and specifically the networks over which debit transactions are processed.  When a cardholder swipes or inserts a debit card at a merchant's payment terminal, a query is sent electronically to the cardholder's bank to confirm that the cardholder's checking account has the necessary funds and that the transaction is otherwise valid.  If no problems are identified, the transaction is authorized and funds are transferred from the cardholder's account to the merchant's account.  ROA.4730-33.  In this transaction, the electronic information transits

through a "debit network," which is the intermediary that provides the physical infrastructure and other services necessary to exchange electronic information between merchants and banks. Pulse and Visa operate competing debit networks.

Because debit networks function as intermediaries, they operate in a two-sided market: On one side of the market are the banks and other financial institutions that issue debit cards ("issuers"), and on the other side are the retail merchants that accept debit cards ("merchants").[1] ROA.4736-37. Debit networks must compete on both sides of the market. They must convince issuers to choose and enable their network on debit cards, and they must convince merchants to accept and use their network at the point of purchase. Setting aside (for now) Visa's anti-competitive conduct, issuers are free to choose how many and which debit networks to enable on the debit cards they issue. ROA.4737-38. Likewise, and again setting aside Visa's conduct, merchants are free to choose how many and which debit networks to accept; if they accept more than one (as they typically do), they are free to choose which to use for any particular transaction. ROA.4736-37. The merchant's decision is known as a "routing" decision.

---

[1] This brief uses "merchants" for both merchants and "merchant acquirers," which provide services for merchants and process transactions by linking the merchant to the debit network. A debit network typically charges an acquirer directly for its services, with those fees passed through to merchants.

Debit networks generally collect two types of fees on every transaction; these fees drive the competition on both sides of the market. ROA.4736. The first fees are "network fees," which are the primary source of revenue for debit networks. ROA.4736. Network fees are paid by both the merchant and the issuer involved in each transaction, and primarily have been assessed on a per-transaction basis. ROA.4736. Network fees can vary widely by the type and identity of the debit network, *see infra*, but in recent years, issuers have paid, on average, about three cents per transaction, while merchants have paid, on average, about five cents per transaction. ROA.4988-90.

The second fees, also assessed on a per-transaction basis, are "interchange fees." ROA.4736. Although debit networks control the price of interchange fees (subject to regulatory constraints), these fees are generally not a source of revenue for debit networks. Instead, interchange fees are paid by merchants, collected by debit networks, and then passed through to issuers, making them a source of revenue for issuers. ROA.4736. Interchange fees are much higher than network fees—on average, between 20 and 50 cents per transaction, depending on the size of issuer and the type of debit network. ROA.4736.

Issuers decide which networks to enable on their debit cards, and merchants decide which networks to accept and prioritize. Issuers primarily base their decisions on the interchange fees they receive from merchants and the network fees

they pay to the network. ROA.4737-38. Merchants primarily base their decisions on the interchange fees they pay to issuers and the network fees they pay to the network. ROA.4737. Debit networks thus must toggle and balance their fees to attract business from both merchants and issuers, and the two-sided nature of competition means that pricing is interdependent: "Raising the price on side A risks losing participation on that side, which decreases the value of the platform to side B. If participants on side B leave due to this loss in value, then the platform has even less value to side A—risking a feedback loop of declining demand." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2281 (2018). Because pricing is interconnected, anti-competitive conduct on one side of the market can harm competition based on how it influences behavior on the other side. ROA.4980-81.

## B. Signature Debit Networks and PIN Debit Networks

There are two types of debit networks: "signature" debit networks and "PIN" debit networks. ROA.4731. Pulse operates a PIN debit network; Visa operates a signature debit network and also operates a PIN debit network called Interlink. These two types of networks differ in two primary ways. First, they use different physical infrastructure. Signature debit networks use the same physical infrastructure as credit card networks, meaning that electronic information sent from the merchant to the cardholder's bank travels along the same wires as would a credit

card transaction. PIN debit networks use the separate physical infrastructure used by ATM machines. ROA.4731-32.

Second, signature and PIN debit networks historically have used different methods to authenticate transactions. A transaction authenticated by the cardholder's signature historically has been processed over a "signature" network, while a transaction authenticated by the cardholder's entry of a PIN has historically been processed over a "PIN" network. ROA.4731-32. Transactions that do not require a PIN or a signature, including internet transactions, historically have been processed over signature networks. ROA.4731-32. However, this distinction is beginning to blur. Pulse recently developed the technology for its PIN network to process transactions that do not require entry of a PIN (including signature-authenticated transactions and internet transactions), ROA.4753-57, and Visa's signature network can now process PIN-authenticated transactions, ROA.4944, ROA.4977-78.

Almost all debit cards today are compatible with one signature network and at least one PIN network. ROA.4733. The signature network enabled on a debit card is branded on the front of the card. ROA.4731-32. Either Visa or Mastercard is the signature network on over 99% of debit cards, with Visa the dominant of the two. ROA.4732. The PIN network enabled on a debit card is sometimes (but not always) identified on the back of the card. There are numerous PIN debit networks,

including Pulse, Interlink, Maestro, STAR, NYCE, ACCEL, and Shazam. ROA.4732.

Network fees on both sides of the market have always been substantially lower for PIN networks than signature networks. ROA.4736. In 2015, for example, merchants paid an average of 2.94 cents per transaction over PIN networks, but 6.34 cents per transaction over signature networks. ROA.4989. Likewise, issuers paid an average of 1.29 cents per transaction over PIN networks, but 3.48 cents per transaction over signature networks. ROA.4989. Nonetheless, most debit card usage in the United States is based on signature debit, which is dominated by Visa. That odd result is primarily owing to Visa's history of anti-competitive conduct.

## C. Visa's Acquisition of a Debit Card Network Services Monopoly

Over the past 25 years, Visa acquired and maintained a general purpose debit card network services monopoly. It did so by adopting anti-competitive strategies that have been successfully challenged under the antitrust laws—but not before those strategies allowed Visa to establish a dominant market position.

In the early 1990s, Visa induced banks to issue Visa-branded signature debit cards by promising to charge merchants high interchange fees and pass them through to the banks. ROA.4980-81. To coerce merchants into accepting Visa-branded signature debit cards despite those high interchange fees, Visa applied its "Honor All Cards" tying arrangement to require merchants that accepted Visa *credit cards* to

also accept Visa-branded signature debit cards. ROA.4980-81. Because Visa's market power in the credit card market meant that few merchants could afford to stop accepting Visa credit cards, merchants had no practical choice but to accept Visa-branded signature debit cards. ROA.4980-81. Merchants challenged the "Honor All Cards" rule as an antitrust violation, and Visa settled by paying billions of dollars. *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568 (E.D.N.Y. April 1, 2003). By that time, however, Visa had built such a substantial debit cardholder base that merchants could not practically stop accepting Visa-branded signature debit cards.

During the same period, Visa (and Mastercard) enforced a rule prohibiting their issuing banks from issuing signature debit cards on competitor networks like Discover. This rule ensured that Visa would dominate the large signature debit marketplace it had illegally fostered. The Justice Department challenged that rule, which was held to violate the antitrust laws. *See United States v. Visa U.S.A. Inc.*, 344 F.3d 229 (2d Cir. 2003).

Although merchants could not practically refuse to accept Visa-branded signature debit cards, some large merchants pushed back by adding PIN pads to their terminals and prompting cardholders to enter their PIN. That way, if a lower-fee PIN debit network was enabled on the card, the transaction would be processed over that network, instead of over Visa's high-fee signature network. ROA.4739;

10

ROA.4952-53. To blunt the threat of PIN prompting, Visa devised a scheme to increase the share of PIN debit transactions routed through its own PIN debit network, Interlink. Visa promised issuers that it would charge merchants high interchange fees on PIN debit transactions routed through Interlink, but only if issuers issued their debit cards as "all-Visa" cards—*i.e.*, cards on which the only signature option (Visa) *and* the only PIN option (Interlink) were *both* Visa-owned networks. ROA.4742, ROA.4748-49. That way, even merchants with PIN pads would have no choice when presented with one of these all-Visa debit cards but to route the transaction over one of Visa's networks and pay Visa's higher interchange fees. ROA.4742, ROA.4748-49. This strategy was enormously effective. By 2010, Interlink was the only PIN network on ██% of Visa-branded signature debit cards. ROA.4748-49.

### D. Pulse's Growth And Threat To Visa's Debit Monopoly

Pulse is a subsidiary of Discover Financial Services, which acquired Pulse in 2005. Between the acquisition and the start of the anti-competitive conduct at issue here, Pulse's PIN transaction volume ████████████████████████ ████████████████. ROA.4741. Pulse competed successfully by optimally balancing fees on both sides of the market, attracting a substantial number of issuers and convincing merchants to prompt their customers for PINs. ROA.4741.

A significant feature of the marketplace during this period was competition to achieve exclusive PIN network placement from issuers. Many issuers prefer placing only one PIN network on their cards, as PIN networks will offer better deals in exchange for being the only PIN network on the issuer's cards. ROA.4741-42. Until 2012, Pulse experienced increasing success in obtaining exclusive placement, notwithstanding Visa's "all-Visa" strategy. ROA.4741-43.

Pulse also invested in new products to compete with Visa for *signature* debit transactions; it developed the technology for its PIN network to process transactions historically processed over signature networks, including signature-authenticated transactions and internet transactions. ROA.4945-46, ROA.4953-56, ROA.4962-63. When PIN debit networks like Pulse process transactions that do not require a PIN, it is often referred to as a "PINless" transaction. ROA.4978. One of Pulse's PINless products in the marketplace today is called Pulse Pay Express. ROA.4777-78. For PINless products like Pulse Pay Express to become truly viable, issuers and merchants must enable and invest in new technology. ROA.4756-57.

PINless products are a significant threat to Visa's signature debit business, which has long benefitted from the absence of competitive threats for signature-authenticated transactions. If PINless routing from PIN debit networks were to become widespread, Visa would face direct competition not only for signature-authenticated transactions, but for the growing share of internet or no-authentication-

needed transactions that historically have been processed over signature networks. That increased competition would lower prices and cut into Visa's market share and profits.  ROA.4756.

### E.  The Durbin Amendment

Visa's anti-competitive conduct in the debit card market did not escape Congress' attention.  On July 21, 2010, as part of the "Dodd-Frank Act," Congress enacted provisions, commonly known as the Durbin Amendment, designed to increase competition in the debit-network market.  First, the Durbin Amendment outlaws the "all-Visa" strategy by requiring issuers to include at least two unaffiliated networks on every debit card.  12 C.F.R. §235.7.  Second, whereas issuers and networks had often dictated merchant routing priority, the Amendment and resulting regulations give merchants complete control.  15 U.S.C. §1693o-2(b)(1)(B).  Third, the Amendment establishes a maximum interchange fee that large banks can receive for each debit transaction, and thus the maximum interchange fee that debit networks can charge merchants.  12 C.F.R. §235.5.

These changes should have increased competition in at least three ways.  First, by giving merchants control over routing decisions, the Amendment should have increased competition and reduced network fees on the merchant side of the market.  ROA.4985, ROA.4990.  Second, by outlawing "all-Visa" debit cards and thus requiring at least one non-Visa PIN debit network on every Visa-branded signature

debit card, the Amendment should have intensified the already-existing competition between signature debit networks and PIN debit networks, which should have caused signature debit network fees to decrease. ROA.4985. Third, again by requiring at least one non-Visa PIN debit network on every Visa-branded signature debit card, the Amendment opened the door for PINless products like Pulse Pay Express to compete for transactions historically processed over signature debit networks. ROA.5004-05.

Visa reached the same conclusion: It expected (and feared) that the Durbin Amendment would increase competition and usher in lower overall debit network fees. ROA.4750-53. Visa documents reveal Visa's belief that ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████ " ROA.7977, ROA.7996. Visa's then-CEO Joseph Saunders told investors that Visa anticipated massive "reductions in Visa's debit volumes and fees" as a result of the Amendment. ROA.4751.

Internally, Visa's outlook was even bleaker. Saunders recognized that ██

████████████████████████████████████████████████████████████

███████████████████████████████ " ROA.7022. Another Visa executive added that

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ .

ROA.7022.  Visa estimated that the Durbin Amendment would ███████████ ████████████████████████████████████ ROA.4752.

## F.  Visa's Anti-Competitive Response

Visa could have responded to these regulatory changes by competing on the merits.  Instead, it launched an anti-competitive strategy to undermine the Durbin Amendment and thwart competition.  This anti-competitive strategy has raised prices to issuers and merchants while increasing Visa's market share.

***Fixed Acquirer Network Fee ("FANF") Structure.***  On the merchant side, Visa used its market power in the credit card network market and monopoly power in the debit network market to impose the "Fixed Acquirer Network Fee" structure for debit network pricing.  Whereas debit network pricing historically has been on a per-transaction basis, the FANF structure integrates a substantial fixed monthly fee with reduced per-transaction fees.  ROA.4760-62.  A merchant must pay the fixed fee as soon as it accepts *any* Visa debit card *or credit card* product.  ROA.4760-61. Thus, a merchant cannot avoid the fixed fee unless it drops acceptance of *all* Visa products, which no merchant can afford to do as a practical matter.  ROA.4760-61, ROA.4958, ROA.4991, ROA.5116.  Visa uses the massive pool of money generated by these fixed fees to both reduce per-transaction fees and fund volume-based discounts.  ROA.4762.

The FANF structure has resulted in higher overall debit network fees for merchants, as the per-transaction discounts are not enough for merchants to fully recoup the fixed fee.  *See* ROA.2271 ███████████████████████████

███████████████████████  Normally, such a price increase would lead to greater competition from competing debit networks.  Here, however, competitors like Pulse cannot undercut Visa's price-raising structure because undercutting the fixed fee within the structure would require merchants to drop acceptance of Visa credit and debit cards, which they cannot practically afford to do.  ROA.4991, ROA.4995.  Moreover, Pulse and other PIN networks lack the market power to demand a comparable up-front fixed-fee tied to credit card and/or debit card acceptance.  ROA.4763-64, ROA.4959-60, ROA.4995-96.[2]  Pulse and other competitors thus must compete based on per-transaction fees, but there, Visa rigs the competition in its favor by using the money it collected through the up-front fee to finance lower per-transaction fees.

The practical effect of Visa's strategy was confirmed by testimony from Kroger that ████████████████████████████████████████

---

[2] Pulse implemented a modest fixed fee in 2013.  ████████████████
████████████████████████████████████████ ROA.4960.  For sake of comparison, the total fee that Pulse collected from Kroger in 2016 was ██████ ROA.4960, while Visa collects ███████████████ in fixed fees from Kroger each year, ROA.5116-17.

███████████████████████████████████████

███████████████████████████████████████

ROA.5115-16.  The FANF structure thus allows Visa to obtain additional routing priority and greater volume from merchants while charging more in overall fees than its competitors.  ROA.4766-68.

*PIN-Authenticated Visa Debit ("PAVD") Mandate.*  On the issuer side, Visa used its monopoly power to impose a new tying arrangement.  Once the Durbin Amendment outlawed the "all-Visa" strategy and required issuers to include at least one network unaffiliated with Visa on every Visa-branded signature card, Visa recognized that it ███████████████████████████████████ ██████████████████████████████████████."  ROA.6544.  And all things being equal, many issuers would prefer to include only one PIN network on their cards, as they can use the promised exclusivity to negotiate for lower pricing.  ROA.4740, ROA.4781.

Instead of competing on the merits and trying to convince issuers to include a Visa PIN option alongside another PIN option, Visa used its monopoly power to *force* issuers to do so.  ROA.4768.  As noted, Visa has the technical capability to process PIN debit transactions over its signature debit network.  This technology is known as "PIN-Authenticated Visa Debit," or "PAVD."  After the Durbin Amendment, Visa imposed the "PAVD mandate," under which banks that issue Visa-

branded signature debit cards (which most banks do) are *required* to enable PAVD functionality, even if the bank would prefer to negotiate an exclusive deal with another PIN debit network. ROA.4768, ROA.4961.[3] While networks like Pulse must compete to win placement as a PIN network on a Visa-branded signature debit card, Visa guarantees itself PIN-authentication placement on 100% of Visa-branded signature debit cards, and in doing so deprives issuers of the ability to negotiate for lower-priced exclusives with other PIN debit networks.

*Merchant and Issuer Agreements.* Visa also entered into volume-based agreements with issuers and merchants. These agreements are designed to lock up the market and thereby protect Visa's lucrative signature debit business from competition from Pulse Pay Express and other debit networks' PINless products. On the merchant side, Visa uses ███████████████████████████████

███████ █████ ███████ ██████ ██ ███████ ██████ ██ ██ ███████ ████

██████████████████████████████. ROA.4772-73. With Kroger, for example, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████. ROA.4774.

---

[3] Alternatively, issuers can enable Interlink, Visa's PIN debit network.

On the issuer side, Visa's agreements provide incentives based on meeting volume thresholds. ROA.4777. These agreements are structured to limit issuers' willingness to enable Pulse Pay Express and other PIN networks seeking to compete with Visa's signature debit business, as enabling that technology could lead merchants to choose not to use Visa. ROA.4777-78. For example, issuers have told Pulse that ███████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████ ROA.4965.

*     *     *

Visa's strategy has worked. While the Durbin Amendment should have increased competition and reduced fees for merchants and issuers, the opposite has happened: Federal Reserve data show that between 2011 to 2015 (the most recent year for which data are available), overall network fees have *increased* for both merchants and issuers. ROA.4988-90. And although Visa's PIN debit volume initially decreased after the Durbin Amendment took effect, Visa's new anti-competitive strategy has allowed it to increase its market share at the expense of Pulse and other debit networks.

## G. Proceedings Below

Pulse filed this lawsuit more than four years ago, in November 2014. Since then, the case has gone almost nowhere, and has gotten there very slowly.

The core count in Pulse's complaint is Count 1, which alleges monopolization in violation of §2 of the Sherman Act. ROA.94-95. Pulse alleged that Visa, through the FANF structure, the PAVD mandate, and its merchant/issuer agreements, "has willfully sought to maintain and enhance [its debit] monopoly through exclusionary conduct." ROA.94. Visa's conduct has "resulted in higher profits for Visa, higher prices charged to merchants, acquirers, and issuers, higher prices for consumers, and less debit network volume and reduced competitive viability for rival PIN debit networks." ROA.28.

The district court decided from the start that Visa had done nothing wrong—or at least had done nothing that the court thought *should be* wrong. Over the ensuing years, the court repeatedly derided Pulse's complaint and insisted that Visa's conduct was perfectly appropriate. When Pulse tried to explain why the FANF structure was unlawful, the court insisted that Visa was competing fairly and that merchants are "not forced to pay" the FANF. ROA.1118; *see also* ROA.1117 ("No, they're not [forcing merchants to pay]. They're pricing the product."); ROA.1201 ("They're not impairing [competition]. They're competing."); ROA.1708 ("No. You lose business from competition."). When Pulse tried to explain why the PAVD mandate was an unlawful tying arrangement, the court insisted that it was nothing but permissible "integration" of Visa's signature and PIN networks. *See* ROA.1606-07 ("On their own cards they have integrated the operation."); ROA.1630 ("It is

integration."); ROA.1472 (stating that issuers "don't have to" enable Visa's PAVD functionality and do so "voluntarily").

Those and other comments became less mystifying (but no less frustrating) as the court revealed its general disdain for antitrust law and antitrust plaintiffs. For example, the court expressed its views that "there are more bad antitrust cases than any other single category," ROA.1125, that the landmark anti-tying case *International Business Machines Corp. v. United States*, 298 U.S. 131 (1936), was "decided wrongly," ROA.1632, and that *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911), was decided wrongly because the "so-called Standard Oil trust" injured only "inefficient kerosene refineries." ROA.1540, ROA.1590; *see also* ROA.1126 (calling Standard Oil a "so-called monopoly"). The "only real monopolies," in the court's view, "are ones supported by the government." ROA.1495.

The court's disdain for antitrust plaintiffs and Pulse's case manifested in two additional ways. First, the court precluded Pulse from conducting ordinary discovery. To this day, four years in, Pulse has not been allowed to take *any* party discovery from Visa—no document requests, no interrogatories, no depositions, nothing. ROA.6936-51. Instead, the vast majority of documents exchanged in this case are from the parties' initial disclosures. As part of those disclosures, Visa produced documents it previously produced to the Department of Justice in

connection with DOJ's investigation of the same conduct at issue here. Although Visa often touts that its DOJ production was approximately 1.7 million pages, many of the documents are duplicative, and all are from 2012 or earlier. Visa did not cite a single one of the documents in its summary-judgment briefing.

Pulse urged the court to allow party and non-party discovery in at least eight separate filings, *see* ROA.404, ROA.675, ROA.721, ROA.752, ROA.766, ROA.6930, ROA.1065, ROA.1077, but the court refused. In one representative exchange, Pulse explained that it needed discovery because "we need to know exactly how Visa is implementing [the strategies] we're complaining about." ROA.1145. The court denied the request—first telling Pulse that it "has no evidence" that Visa uses the FANF to finance discounts on per-transaction fees, and then refusing to allow Pulse the opportunity to obtain that evidence: "No. You're not going to get discovery to find out that." ROA.1198; *see also* ROA.1634-36, ROA.1725-27, ROA.1774-75.

Instead of allowing party discovery, the court devised its own requests for information—which often required *Pulse* to provide information to *Visa*, ROA.394-95, or required both parties to conduct useless exercises like preparing an "accounting of fees" based on hypothetical facts, ROA.203, ROA.392-93. The court often suggested that Pulse should be required to produce unilateral discovery to Visa because "[Pulse] started it." ROA.1764; *see* ROA.1322 ("Shouldn't Visa depose

Pulse first? … [Visa] shouldn't have to defend against a case that it hasn't had the opportunity to look at beyond the pleadings and our lovely get-togethers."); ROA.1764 ("[S]ince [Pulse] brought the lawsuit, it's going to have to show Visa what it's done before I make them reveal their records.").

Occasionally, the court suggested that it merely wanted to avoid over-burdening Visa. But any such pretense was soon shattered. While the proceedings below were ongoing, a group of merchants was pursuing antitrust claims against Visa, based partly on the same conduct at issue here, in multidistrict litigation to which Pulse is not a party (the "MDL"). *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 14-md-1720 (E.D.N.Y.). After Visa sought substantial third-party discovery from Pulse in the MDL, Pulse requested permission from Judge Hughes to participate in the MDL discovery. ROA.404. Allowing Pulse to take reciprocal discovery would have imposed almost no burden on Visa, which was already producing the same information to merchants in the MDL. *See* ROA.404-08. The court nonetheless denied Pulse's motion without explanation. ROA.645. Pulse later made an even more modest request simply to *access* the debit-related discovery Visa *already* produced in the MDL, requiring only the click of a button. ROA.1065-67, ROA.1077-79. The court refused. ROA.1082.

In all, after four years, the court allowed Pulse to obtain only: (1) Visa's dated and limited DOJ production; (2) about ▮ agreements between Visa and merchants

23

and acquirers from the third quarter of 2015, ROA.383; and (3) narrowly targeted discovery from *one* merchant (Kroger) and *one* acquirer (First Data), ROA.647. Pulse has not received any discovery in critical areas such as: Visa's data and financial performance; Visa's agreements with issuers; Visa's current routing agreements with merchants and acquirers; attempts by Visa to block PIN debit networks from competing for its signature debit business; the effects of Visa's conduct on other PIN debit networks' strategy and market share over time; and Visa's internal ongoing assessments of the purpose and effects of its debit strategy.

The court's disdain for Pulse's case is also apparent in how slowly this case has proceeded. In stark contrast to the rapid pace of change in the debit industry and the urgency of halting Visa's conduct, the court has dragged its feet at every possible opportunity. Visa moved to dismiss in January 2015, arguing primarily that Pulse failed to allege antitrust injury. ROA.157. After the motion was fully briefed, the court took *nine months* to produce a *one-sentence* opinion: "While the complaint is not compellingly lucid, Pulse Network, LLC, has alleged sufficient facts that probably adequately state a claim for relief." ROA.318.

The parties then spent two years accomplishing essentially nothing, with Pulse trying to move the case forward by conducting discovery and the court resisting at every opportunity. Despite the absence of any meaningful discovery, the court eventually allowed Visa to move for summary judgment. ROA.3179. Visa briefed

both standing and the merits, after which the court ruled that it would "defer the issue of injury to competition [*i.e.*, the merits] until it has decided whether [Pulse] has an antitrust injury." ROA.990. So limited, the summary judgment motion presented the same legal question as the motion to dismiss from three years earlier. The court nonetheless waited *ten months* to resolve the motion, ruling that Pulse lacked antitrust standing. ROA.8555-61.

To borrow this Court's description of a previous summary-judgment opinion by the same district court: "[T]he district judge issued a [seven]-page opinion with few citations to either record evidence or relevant legal authority—not surprising given that neither the summary judgment evidence nor the law support the conclusions he reached. The opinion consists almost entirely of conclusory statements." *U.S. ex rel. Little v. Shell Expl., Prod. Co.*, 602 F. App'x 959, 975 (5th Cir. 2015). The court's standing analysis was nominally divided into three sections: injury-in-fact; antitrust injury; and remoteness. The analysis within each section, however, does not identify any relevant legal standards, cite any record evidence, or follow any discernible structure. The analysis swings wildly among different aspects of Visa's conduct and the different market participants it affects, making it difficult to understand the precise grounds on which the court ruled.

In the "Injury-In-Fact" section, the court acknowledged that Pulse's "PIN debit volume has decreased" and that it "cannot generate enough interest and

investment in its new products." ROA.8558. But it opined that "[e]ven if Visa stopped using its current strategy, Pulse would not necessarily win more business." *Id.* The court believed that other debit networks have "adopted a pricing structure like Visa's" and speculated that "it is unlikely that these networks will revert to per-transaction fees only." ROA.8558-59. In reference to Pulse's PINless injury, the court stated that "Visa is not the problem" based on its belief that ████████ ██████████████████████████████████████████████████████████████████ ███████████████████████ ROA.8559.

The "Antitrust Injury" section of the opinion is particularly hard to follow. It does not set out the legal standard for antitrust injury or follow any analytical framework, and it bounces back and forth between the FANF structure and the PAVD mandate. Most problematic, the only conclusions are about harm to competition— *i.e.*, the merits—rather than antitrust injury. *But see Doctor's Hosp.*, 123 F.3d at 306 (courts must "assum[e] an antitrust violation" when assessing standing); Areeda & Hovenkamp, *Antitrust Law* ¶335f (4th ed.) (same). For example, the court stated that Visa may impose the FANF structure "without implicating the antitrust laws," that Visa's PAVD mandate "does not necessarily mean that it is behaving anti-competitively," and that the PAVD mandate only makes Visa "an additional competitor" for merchant business. ROA.8560-61. All of those conclusions— which are wrong in any event—are about harm to competition, not antitrust injury.

Finally, in a short section titled "Remoteness," the court appeared to rule that a monopolist's competitors can *never* have antitrust standing. It held that merchants, because they are "the payers" of supra-competitive prices, are "better and more directly positioned to challenge Visa" than is Pulse. ROA.8561. The court did not appear to recognize that competitors and customers suffer distinct injuries from a monopolist's exclusionary conduct: loss of transaction volume and higher prices, respectively.

## STANDARD OF REVIEW

This Court reviews "a grant of summary judgment *de novo*, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." *Kariuki v. Tarango*, 709 F.3d 495, 501 (5th Cir. 2013). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## SUMMARY OF THE ARGUMENT

The complaint in this case makes straightforward allegations about a classic antitrust violation. Indeed, if there is any twist, it is that Congress found the threat to competition sufficiently obvious that it intervened legislatively, and Visa's response thwarted not only competition, but Congress' will. Visa, a clear monopolist in the market for debit network services, has adopted exclusionary practices to

foreclose competitors from the marketplace, reduce competition, and raise prices. Pulse, a direct competitor of Visa's, was directly injured and quite obviously has standing to challenge these exclusionary practices. Antitrust standing "is clear and seldom challenged" when "the plaintiff alleges that its rival engaged in an exclusionary practice designed to rid the market of the plaintiff, to preclude its entry, or raise its costs, so that the defendant could maintain or create a monopoly." Areeda ¶348d. That is exactly what Pulse alleged here.

Under a straightforward application of settled law, then, Pulse has antitrust standing. Pulse suffered injury-in-fact because (1) Visa's conduct caused it to lose PIN debit volume and revenue; and (2) Pulse has been impeded in its efforts to compete using its PINless products. Those injuries are "antitrust injury" because they flow directly from the anti-competitive aspects of Visa's post-Durbin scheme: Pulse is complaining that Visa is able to raise network fees to merchants and issuers—*i.e.*, to harm competition—only through conduct that excludes competitor networks like Pulse. And Pulse is a "proper plaintiff" because its injury is not speculative or remote; Pulse is a direct competitor of Visa's and is directly harmed by Visa's conduct. In short, just like any excluded competitor, Pulse "clearly has standing to challenge the conduct of rival(s) that is illegal precisely because it tends to exclude rivals from the market, thus leading to … higher prices." Areeda ¶348a.

The district court's indefensible decision concluding otherwise is the culmination of its repeated efforts to stymie Pulse's prosecution of this case. Pulse filed its complaint more than four years ago, yet despite Pulse's best efforts, precious little has been accomplished. The court repeatedly disparaged antitrust law, antitrust plaintiffs, and Pulse's theory of the case; refused to allow Pulse to obtain meaningful discovery; and unnecessarily delayed proceedings in every possible way. It has become abundantly clear that Judge Hughes is unable or unwilling to allow Pulse to pursue its case in a timely and meaningful manner. Accordingly, to ensure that these serious antitrust claims are adjudicated in an appropriate, timely, and dispassionate manner, this case should be reassigned on remand. At a bare minimum, this Court should reverse and remand with instructions to allow Pulse to obtain the meaningful discovery necessary to adjudicate this case.

## ARGUMENT

### I. Pulse Has Antitrust Standing.

Section 4 of the Clayton Act broadly confers standing on "any person … injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. §15(a). On its face, "§4 contains little in the way of restrictive language." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337 (1979). This reflects Congress' "expansive remedial purpose" in enacting §4: "to create a private enforcement mechanism that would deter violators and deprive them of the fruits of

their illegal actions, and would provide ample compensation to the victims." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982). Despite this "breadth of the congressional purpose," *id.* at 478, courts have held that "[n]ot every person who complains of injury as a result of violation of the antitrust laws has standing." *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988). That said, the bar is not particularly high: An antitrust plaintiff need show only injury-in-fact to its "business or property," "antitrust injury," and "proper plaintiff status." *Doctor's Hosp.*, 123 F.3d at 305. Pulse readily satisfies all three elements.

## A. Pulse Has Suffered Injury-In-Fact.

Injury-in-fact is not a close question. To satisfy this requirement, a plaintiff must show that it has suffered "an injury … proximately caused by the defendants conduct." *Id*. Economic loss is the prototypical injury-in-fact, both in the antitrust context and more generally under Article III. *See, e.g.*, *Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 302 (5th Cir. 2005); *Midland Telecasting Co. v. Midessa Television Co.*, 617 F.2d 1141, 1144-45 (5th Cir. 1980). Visa's conduct has inflicted two straightforward economic injuries on Pulse: Pulse has lost PIN debit volume and revenue (which Visa does not dispute); and Pulse has been impeded from using its PINless products to compete for transactions historically processed over signature networks. Either is sufficient to satisfy the injury-in-fact requirement, and both do so here.

### 1. Pulse has lost PIN debit volume and revenue.

While Pulse should have experienced an *increase* in PIN debit transaction volume and revenue after the Durbin Amendment, both figures declined dramatically after Visa implemented its post-Durbin strategy. In absolute terms, Pulse's debit volume from 2012 to 2016 declined precipitously from ███████████ to ███████████ transactions. ROA.4941-42. In terms of market share, Pulse's overall debit network market share decreased ███████████████ between 2012 and 2015. ROA.4942, ROA.4966-67. These losses are prototypical injury-in-fact; indeed, Visa did not even dispute this "pocket-book" injury-in-fact below. ROA.3194 (contesting only "antitrust injury").

The district court, however, was another story. Citing no record evidence, and ignoring the undisputed evidence discussed above, the court concluded that Pulse lacked injury-in-fact—indeed, that Pulse's evidence did not even raise a genuine dispute about whether Pulse lost market share because of Visa's conduct. ROA.8558-59. That conclusion is baffling, and cannot be squared with the record evidence or with Visa's concession that Pulse lost market share and revenue because of Visa's post-Durbin conduct.

While the court did not explain exactly why it believed that Pulse did not satisfy its summary-judgment burden on injury-in-fact, it did express concerns that appeared to relate to redressability, opining that "[e]ven if Visa stopped using [the

FANF structure], Pulse would not necessarily win more business" because "other debit networks" will "likely" adopt similar pricing structures. ROA.8558-60. That speculative assessment is flawed on every level.

At the outset, whatever might happen in a competitive marketplace if Visa's anti-competitive conduct is enjoined is largely irrelevant to whether the injury that Pulse has alleged is redressable because Pulse seeks money damages for the undisputed harm to its market share and revenue that has *already* occurred, and damages are the quintessential form of redress for past unlawful conduct. *See, e.g.*, *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 912 (9th Cir. 2011). At any rate, the court's suggestion that other PIN debit networks would implement the same fixed-fee structure as Visa betrays the court's misunderstanding of this case. The entire premise of Pulse's FANF-related allegations is that other PIN debit networks cannot coerce merchants to pay a massive fixed fee on the front end to fund volume-based "rebates" on the back end in the way that Visa does. *See* ROA.4862-65. The notion that "other debit networks" could force merchants to pay a substantial fixed fee thus misses the point: Visa is a monopolist acting in ways its competitors cannot replicate.

That notion is also contradicted by the record. For example, First Data testified that ███████████████████████████████████████████

████████████████████████████████████████████████████████

ROA.5060; *see also* ROA.4763 ("PIN debit networks cannot impose a substantial fixed fee collecting ▮▮▮▮▮▮▮▮▮▮▮▮▮ like Visa can with the FANF."), ROA.4959-60 ("Visa's FANF structure is something that PULSE cannot replicate.").  While other debit networks (including Pulse) have tried charging small fixed fees, the evidence shows that those fees are "dwarfed by the FANF" and do not produce nearly enough revenue to finance per-transaction discounts comparable to Visa's.  ROA.4763-64.  And there is *no* record evidence supporting the district court's speculation about how other debit networks would act if Visa's conduct is enjoined—primarily because the court did not allow third-party discovery of other debit networks.

### 2.  Pulse has suffered harm to its PINless business.

Visa's conduct has inflicted economic harm on Pulse as a nascent competitor for PINless transactions.  *See Sanger Ins. Agency v. HUB Int'l*, 802 F.3d 732, 737 (5th Cir. 2015) (holding that nascent firm had standing to challenge exclusionary conduct).  As explained, Pulse has made substantial investments to develop new PINless products, including Pulse Pay Express, to directly compete against Visa's signature network.  ROA.4755-56.  For Pulse Pay Express to succeed, merchants and issuers must enable and invest in technology that allows them to process PINless transactions.  ROA.4756-58.  The record evidence demonstrates that Visa's post-

Durbin conduct—and in particular its agreements with issuers and merchants that use assorted carrots and sticks to dissuade them from using Pulse Pay Express—impedes this enablement and these investments and thereby inflicts economic harm on Pulse. ROA.4756-58, ROA.4961-70, ROA.5024-25, ROA.5029-30. Visa did not dispute this form of injury-in-fact below, or that "[r]ecovery can be had for a wrongfully frustrated attempt to enter a business." *Hayes v. Solomon*, 597 F.2d 958, 973 (5th Cir. 1979).

Not only has Visa's post-Durbin conduct directly impeded Pulse's entry into the market for PINless transactions, it also has caused Pulse to lose PIN debit volume and market share, *see supra*, which has deprived Pulse of the "scale and relevance … necessary to convince Pulse's issuers and acquirers to invest in … new products" like Pulse Pay Express. ROA.4966-67; *see* ROA.4771, ROA.4776, ROA.4786-88. As to this form of injury-in-fact, Visa claimed that Pulse did not begin to lose PIN debit volume until 2015, three years after Visa implemented the anti-competitive strategies at issue here, and thus that any difficulties Pulse Pay Express experienced were caused by "competitive obstacles unrelated to Visa's challenged conduct." ROA.8519-20. Visa is simply wrong on the facts. Visa relied on public earnings releases by Discover (Pulse's parent company), which state that "PULSE transaction dollar volume" increased in 2012, was flat in 2013, and increased in 2014. ROA.8522. Those numbers, however, include not just PIN debit

transactions, but transactions across *all* segments of Pulse's business, including ATM transaction volume and issuer processing volume, neither of which has anything to do with this case. When PIN debit volume is isolated, the data unequivocally show that Pulse ██████████████████████████████████

██████████████████████████████████████ ROA.2406; *see* ROA.4941-42. These decreases in market share coincided with and were caused by Visa's illegal conduct—and, at a minimum, give rise to a factual dispute regarding causation. ROA.4824-27.

The district court's analysis was equally misguided. The court acknowledged that Pulse has struggled to "generate enough interest and investment" in Pulse Pay Express, but reasoned that "Visa is not the problem." ROA.8558-59. As supposed proof that Visa was blameless, the court stated that a PINless product offered by the STAR network ████████████████████████████████████████

███████████████████ ROA.8559. According to the court, ███████████████

███████████████ proves that Visa's conduct did not foreclose competition for transactions historically processed over signature networks. ROA.8559-60.

To the contrary, "[a]n agreement to restrain trade may be unlawful even though it does not *entirely* exclude its victims from the market." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983) (emphasis added). That Visa has not foreclosed competition entirely is

35

therefore largely beside the point; the relevant question is whether competitors would have had *more* success but for Visa's exclusionary conduct. On that question, the record evidence plainly supports Pulse's allegation that it and other PIN debit networks would have had more success with their PINless products if not for Visa's anti-competitive conduct. For example, a Pulse executive averred that ██████████

████████████████████████████████████████████████████████████

██████████████████████████████████ ROA.5024-25, and First Data's corporate representative testified that ████████████████████████████████

████████████████████████ ROA.5074; *see also* ROA.4965, ROA.5073-76, ROA.5107. Indeed, the only PINless product STAR offers that, like Pulse Pay Express, can process signature-authenticated transactions and no-authentication transactions over $50 is "STAR Access," ████████████████

████████████████████ ROA.4916, ROA.5075. In short, any suggestion that Visa has definitively established that its conduct causes no injury whatsoever is divorced from reality.

### B. Pulse Has Suffered Antitrust Injury.

#### 1. The antitrust injury requirement

The more substantial disagreement between the parties below was about antitrust injury. An antitrust plaintiff must show not only that it was injured by the defendant's conduct, but also that its injuries are "of the type the antitrust laws were

intended to prevent" and "flow[] from that which makes the defendant's acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Thus, a competitor that loses market share because the defendant engages in pro-competitive conduct that lowers prices suffers injury, but not antitrust injury.

In assessing antitrust injury, courts are not supposed to pre-determine the merits, but instead must "assum[e] an antitrust violation has occurred" and ask whether the plaintiff's injury flows from the conduct that allegedly constitutes that assumed violation. *Doctor's Hosp.*, 123 F.3d at 306; *see also Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 76 n.9 (2d Cir. 2013) ("When assessing antitrust injury, we assume that the practice at issue is a violation of the antitrust laws."); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 310 n.8 (3d Cir. 2012) (same); Areeda ¶335f (same).

The antitrust-injury requirement originated in the Supreme Court's *Brunswick* decision. There, three bowling centers sued Brunswick, alleging that its acquisition of multiple failing bowling centers was unlawful because it gave Brunswick significant market power. 429 U.S. at 480. The plaintiffs were injured because they would have made more money if the failing bowling centers closed instead of being rescued. *Id.* at 481. The Court agreed that Brunswick's acquisition injured the plaintiffs, but held that this was not "antitrust injury" because it was not caused by that which allegedly made Brunswick's actions anti-competitive—*i.e.*, accrual of

significant market power. *Id.* at 487. To the contrary, the plaintiffs "would have suffered the identical 'loss' … had the acquired centers instead obtained refinancing or been purchased by 'shallow pocket' parents." *Id.*

In contrast, this Court found the antitrust injury requirement readily satisfied in *Doctor's Hospital*. There, the plaintiff hospital sued a competing hospital and a PPO that allowed the competing hospital, but not the plaintiff, to join. The plaintiff alleged that the competitor used its market power to convince the PPO to exclude the plaintiff, and that it lost revenue by not being in the PPO. 123 F.3d at 304. This Court assumed *arguendo* that the agreement was unlawful and held that the plaintiff's injury fell "easily within the conceptual bounds of antitrust injury." *Id.* at 305. That injury—lost revenue from being excluded—"flows from the allegedly exclusionary conduct of its competitor … and is exactly the kind of anticompetitive effect that [its competitor] sought." *Id.* at 306. In reaching that conclusion, the Court emphasized that the antitrust-injury inquiry "should not become the tail wagging the dog in 'classical' antitrust cases such as this one by an allegedly excluded competitor." *Id.*

This is just such a "classical" antitrust case: Pulse is an excluded competitor that has lost market share and revenue because Visa, its direct competitor, engaged in anti-competitive conduct designed to exclude it from the market. Both injuries outlined above—(1) decreased PIN debit volume and revenue; and (2) impediments

to competing for PINless transactions—flow directly from the anti-competitive aspects of Visa's post-Durbin scheme.

## 2. Pulse's loss of PIN debit volume and revenue is antitrust injury.

Pulse's loss of PIN debit volume and revenue flows directly from the anti-competitive aspects of the FANF structure and PAVD mandate.

a. The FANF structure is anti-competitive because it increases network fees for merchants while preventing rivals from undercutting those prices. This anti-competitive effect must be assumed for purposes of assessing antitrust injury, *Doctor's Hosp.*, 123 F.3d at 306, but in all events the mechanism is not complicated: Visa adopted a price structure that raises overall network fees on merchants but that its competitors cannot undercut. It did this by using its market and monopoly power to extract up-front fees from merchants that merchants cannot practically avoid, which it uses to fund discounts on per-transaction fees for some of those very same merchants. Visa is accordingly able to "win" merchant routing priority even though it charges more in total fees than its competitors.[4]

---

[4] The FANF structure has similar anticompetitive effects as a price structure previously used by Microsoft that was prohibited by a consent decree with DOJ. Just like Visa's FANF structure, Microsoft's pricing structure deterred manufacturers "from using competitive alternatives to Microsoft operating systems," which illegally reduced competition. 59 Fed. Reg. 42845-02, 42,847 (Aug. 19, 1994); *see United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995).

The harm to Pulse's PIN debit volume and revenue results from the exact same anti-competitive mechanism. The FANF structure increases network fees for merchants by preventing competitors like Pulse from undercutting Visa's price structure. And precisely because Pulse is unable to undercut Visa's price structure despite charging lower overall fees, Pulse suffers economic harm—*i.e.*, it obtains fewer transactions and generates less revenue. In other words, competition is harmed because the FANF structure prevents merchants from avoiding the price increase in a way that restricts rival networks from competing, and Pulse is harmed because it is one of those rival networks. It really is that simple.

Visa's response below was to pretend that the fixed up-front fee and the discounts on per-transaction fees have nothing to do with each other. According to Visa, Pulse is merely complaining about having to compete against lower per-transaction fees, and "protecting Pulse from lower, non-predatory fees is not the purpose of antitrust law." ROA.3204. That facile framing blinks reality. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992) (noting the importance of considering "actual market realities"). The discounts on per-transaction fees would not be the same without the fixed up-front fee that finances them; they were designed to operate together. Visa itself said so, repeatedly. A Visa executive described the fixed fee as ████████████████████████████

████████████████████████████████████████████████████

ROA.8387.  An internal Visa presentation stated that the █████████████

███████████████████████████████████████████████████████

███████████████████████████████████  ROA.6891.  And an internal

email ████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████  ROA.6544; *see also* ROA.4857-58.  As Visa's own words make

clear, the FANF structure was designed—and thus must be evaluated—as an

integrated fee structure.

Indeed, if all Visa wanted to do was compete by offering lower per-transaction

fees, it would have just lowered its per-transaction fees.  Pulse would have welcomed

the opportunity to compete on price without the FANF.  But because Visa ██████

████████████████████████████████████████████████  ROA.6891, it

opted for ██████████████████████" made possible only by its market and

monopoly power, ROA.8387.  Thus, as Pulse's economics expert explained, "[t]he

correct way to view the economic effects of the FANF structure is to assess it as an

integrated structure."  ROA.4994.  That integrated structure—just as it was designed

to do—impedes competition, which results in decreased PIN debit volume for Pulse

and higher prices for merchants.

b. The harm to Pulse's PIN debit volume from the PAVD mandate also is

antitrust injury.  The PAVD mandate is anti-competitive because it is a tying

arrangement that impairs competition on the issuer side of the market, resulting in higher issuer-side network fees. These anti-competitive effects must be assumed for purposes of assessing standing, *Doctor's Hosp.*, 123 F.3d at 306, but once again, the mechanism is not complicated: The PAVD mandate requires banks that issue Visa-branded signature debit cards (which most banks do) to enable Visa's PAVD functionality on those cards (unless the cards already include Visa's Interlink PIN debit network). This increases prices for issuers for two reasons—first, because it prevents issuers from negotiating lower-priced exclusives with other PIN debit networks, and second, because Visa charges issuers more in network fees for each PAVD transaction than rival networks like Pulse charge for each PIN debit transaction. *See* ROA.4998-5004.[5]

The harm to Pulse's PIN debit volume and revenue result from the exact same mechanisms. First, because issuers must enable PAVD or Interlink and are therefore prevented from entering into an exclusive deal with Pulse, Pulse loses out on the transaction volume it would have secured if it had obtained exclusive placement. The issuers are harmed precisely because Pulse is harmed—*i.e.*, it is because Pulse

---

[5] The anti-competitive effects of the PAVD mandate are analogous to those caused by the "Honor All Cards" tying arrangement that Visa was forced to halt to settle an antitrust lawsuit. *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568. Just like the PAVD mandate, the "Honor All Cards" rule allowed Visa to use its monopoly power to insulate itself from the market forces that otherwise would constrain its pricing options.

does not obtain exclusive placement that issuers cannot benefit from the attractive pricing Pulse could have offered if it obtained exclusive placement. Second, every time a *merchant* routes a transaction over Visa's PAVD option, the *issuer* pays more than it would have had the merchant not used PAVD. Visa then induces merchants to use the PAVD option by charging lower merchant-side fees. Pulse's injury is a necessary part of that competitive harm—*i.e.*, issuers pay more precisely because Visa has rigged the market in favor of routing transactions over Visa's PAVD option instead of Pulse's network. The competitive harm to issuers (which must be assumed) thus occurs precisely because the PAVD mandate causes Pulse to lose merchant routing priority to Visa.

The PAVD mandate also keeps *signature* debit network fees artificially high for merchants, thereby protecting the longtime centerpiece of Visa's debit network business. As noted, the Durbin Amendment was expected to exert downward pressure on signature debit pricing by forcing Visa's signature debit network to directly compete with at least one unaffiliated, lower-priced PIN debit network. ROA.5004. The PAVD mandate softens this competitive effect because more of the signature debit volume that Visa loses because of its high prices is recaptured by Visa as PIN debit volume through PAVD. ROA.5004-05. Because the PAVD mandate reduces the cost of maintaining high signature debit prices, Visa can maintain a higher price. ROA.5004-05. The economics of this effect specifically

depend on Visa using the PAVD mandate to obtain a higher share of PIN-authenticated transactions, which is precisely what harms Pulse. ROA.5004-06.

In the district court, Visa argued that Pulse's injury from the PAVD mandate is not antitrust injury because it results from *increased* competition—that is, from having to compete with a Visa PIN option for routing priority instead of securing exclusive placement. Being forced to compete on the merchant side of the market, Visa says, does not cause antitrust injury. ROA.3200-03, ROA.8513-15. The district court appears to have embraced this argument, reasoning that the PAVD mandate has merely "injected another network through which merchants … can route PIN transactions." ROA.8560. But that argument ignores the nature of tying claims (which often involve injecting another "competitor," *i.e.*, injecting someone with a monopoly in one market into another) and *Doctor's Hospital*, which requires courts assessing antitrust standing to *assume* that the alleged conduct (*i.e.*, the PAVD mandate) is anti-competitive. Visa's argument is at best an argument that the PAVD mandate is not illegal because it is pro-competitive, not an argument that Pulse's injury does not flow from this tying arrangement.

In all events, Visa's argument—much like its argument with respect to the FANF structure—ignores half of the story. Pulse is not losing PIN debit volume because Visa is winning some fight on the merits for merchant business, but because Visa forced itself into the ring and then made Pulse fight with one hand tied behind

44

its back: It used a tying arrangement to force its PAVD functionality onto debit cards, thereby preventing Pulse from offering issuers exclusive deals, and then used the PAVD network fees it coerced from issuers to fund offers that make PAVD more attractive to merchants. It is that anti-competitive conduct, not competition on the merits, that causes Pulse harm.

### 3. The economic harm inflicted on Pulse as a nascent competitor for PINless transactions is antitrust injury.

The economic harm inflicted on Pulse as a nascent competitor for transactions historically routed over signature networks (*i.e.*, PINless transactions) flows directly from the anti-competitive aspects of Visa's post-Durbin scheme. In short, Visa's conduct harms competition by inhibiting competitors like Pulse from competing for transactions historically processed over signature networks. The harm to Pulse thus flows directly from the anti-competitive aspects of Visa's conduct. Indeed, Visa did not argue otherwise below, and although it is hard to say for sure, the district court did not appear to hold otherwise. Instead, the court's cursory antitrust injury analysis simply ignored Pulse's PINless claims.

First, Visa's agreements with merchants condition rebates on the merchant reaching Visa signature debit volume targets. Both by themselves and when coupled with the FANF structure, these agreements undermine competition by discouraging or preventing merchants from investing in Pulse's (and other PIN networks')

PINless technology.[6]   Although Pulse Pay Express can provide merchants with substantial per-transaction savings over Visa's signature debit network, Pulse has learned from several merchants ███████████████████████████████

████████████████████████████████████████████████

███████████████████████████. ROA.5026-27.

Second, Visa's agreements with issuers provide incentives based on meeting signature network or overall debit volume thresholds.   ROA.4777.   These agreements are structured to limit issuers' willingness to enable Pulse Pay Express and other PIN networks seeking to compete with Visa's signature debit business, because enabling them could lead more merchants to use them.  ROA.4777-78. Thus, although issuers save money when transactions are processed with Pulse Pay Express,  issuers  are ████████████████████████████████████

████████████████ ROA.5024-25, ROA.5029-30.[7]

---

[6] These exclusive-dealing or quasi-exclusive-dealing agreements can be unlawfully anti-competitive when entered into by a monopolist, *see generally Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961), and Pulse will prove on the merits that Visa's agreements violate the antitrust laws.

[7] As noted, the FANF structure and PAVD mandate indirectly impede Pulse's ability to compete for PINless transactions by depriving Pulse of the scale and relevance necessary to convince issuers and merchants to support Pulse Pay Express. *See supra*.  This harm also is antitrust injury because it flows directly from the anti-competitive effects of the FANF structure and PAVD mandate, as explained above.

Again, when assessing standing, this Court must assume that Visa's conduct violates the antitrust laws and harms competition. *Doctor's Hosp.*, 123 F.3d at 306. The only question is whether the harm to Pulse's PINless business flows from the anti-competitive effects of the merchant and issuer agreements. It plainly does. Visa's merchant and issuer agreements impede Pulse's ability to compete for transactions historically processed over signature networks, and "[i]t is this same exclusion from the market that denies consumers the benefit of the pressure to lower prices that would likely accompany [Pulse's] becoming a viable competitor." *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 967-68 (11th Cir. 2006); *see Doctor's Hosp.*, 123 F.3d at 306.

## C. Pulse Is a Proper Plaintiff.

The Clayton Act "is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948). Nevertheless, "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action." *McCready*, 457 U.S. at 477. Accordingly, courts must ensure that the plaintiff's injury is not "too remote from the violation and the purposes of the antitrust laws to form the predicate for a suit." *Id.* To make that determination, this Court considers "(1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether

other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment." *McCormack*, 845 F.2d at 1341.

Visa did not argue below that Pulse's injuries were too remote from Visa's conduct. While that did not stop the district court from ruling against Pulse, *see infra*, it does reflect that there is no legitimate basis to question Pulse's "proper plaintiff" status. First, neither Pulse's injury, nor its connection to Visa's conduct, is speculative. Pulse is Visa's direct competitor and both a target and a victim of Visa's exclusionary conduct. Second, Pulse's injury is not derivative of anyone else's injury or "passed through" from some other entity. Pulse's injury is the direct result of Visa's exclusionary conduct. Third, there is no prospect of duplicative recovery. If Pulse prevails, it will be entitled to the profits it would have obtained absent Visa's anti-competitive conduct. Those lost profits will not be recoverable by anyone else.

It is difficult to discern the exact basis of the district court's contrary ruling, as it did not cite any cases or refer to any record evidence in its one-paragraph analysis. ROA.8561. But it appears that the court believed that merchants are more "directly" harmed by Visa's conduct or was concerned about the prospect of duplicative recovery. ROA.8561. The court's mistake was in failing to recognize that different market participants can suffer different types of harm from the same monopolistic conduct. Indeed, it is black-letter law that exclusionary practices like

those alleged here injure *both* the monopolist's competitors (*i.e.*, Pulse) *and* its customers (*i.e.*, merchants and issuers), and do so in distinct ways: Exclusionary practices "injure rivals by destroying their profits," and separately "injure[] consumers … through higher product prices." Areeda ¶339d. There is "no sense in which the lost-profit injury incurred by the competitors duplicates that incurred by the consumers." *Id.*; *see Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 816 (D.C. Cir. 2001) ("Irrespective of consumer injury, an excluded competitor … suffers a distinct injury if it is prevented from selling its product.").

Here, damages awarded to Pulse would compensate for the transaction volume and revenue Pulse would have earned absent Visa's conduct. Merchants, on the other hand, would recover the difference between the supra-competitive fees they paid and the lower fees they would have paid absent Visa's conduct. The same is true for issuers. There is no duplicative recovery because Pulse does not "seek damages for profits it would have earned at [the] higher, less competitive prices," *Andrx*, 256 F.3d at 816, but rather seeks only damages based on the lower market prices that would have prevailed absent Visa's conduct. Thus, "permitting [Pulse] to proceed in the circumstances of this case offers not the slightest possibility of a duplicative exaction from [Visa]." *McCready,* 457 U.S. at 474-75.

\*     \*     \*

Pulse is a direct competitor of Visa's that has suffered unquestioned harm from Visa's post-Durbin conduct—conduct that *is* anti-competitive, but in all events must be *assumed* anti-competitive at this stage. While one could sensibly want to see more evidence before coming to any conclusions on the merits, the district court's rulings that Pulse has not suffered injury-in-fact and that competitors are somehow improper antitrust plaintiffs are truly remarkable. In short, the decision below simply cannot stand.

## II. The District Court's Legal Errors, Mismanagement Of The Case, And Hostility Toward Pulse Necessitate Reassignment On Remand.

The only remaining question is whether this case should return to the same district court that has wasted four years of the parties' time and has plainly prejudged the merits, or to a different district court that can efficiently and fairly guide this case toward a final resolution. The latter is plainly the better course.

This Court's statutory authority to require such further proceedings "as may be just under the circumstances," 28 U.S.C. §2106, includes "supervisory powers" to order cases "reassigned" on remand. *Johnson v. Sawyer*, 120 F.3d 1307, 1333 (5th Cir. 1997). This Court has applied two tests to determine whether a case should be reassigned. Under the first test, the Court considers three factors: "(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether

50

reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Little*, 602 F. App'x at 975. Under the second, more lenient test, reassignment is warranted whenever "the facts might reasonably cause an objective observer to question [the judge's] impartiality." *Id.*

Reassignment is warranted under either test. Judge Hughes improperly prejudged the merits of this case and has deliberately derailed the proceedings ever since. He disparaged Pulse's case, antitrust law, and antitrust plaintiffs; refused to allow Pulse to obtain meaningful discovery; delayed the case at every opportunity; and issued a summary-judgment opinion that neither respects the governing standards nor applies the governing law. Reassignment is the only way to ensure that these serious antitrust claims receive their proper day in court.

## A. The District Court Repeatedly Attacked Pulse's Case, Embraced Visa's Defenses, and Criticized Settled Antitrust Principles.

When a judge openly disparages the plaintiff's case—especially at preliminary stages when the judge is required to draw inferences *in favor of* the plaintiff—this Court has readily concluded that the judge would "have substantial difficulty in putting out of his or her mind previously-expressed views or findings." *Id.* (reassigning case from Hughes, J.). In *Simon v. City of Clute*, 825 F.2d 940 (5th Cir. 1987), for example, the district court referred to the plaintiffs—city police officers pursuing a civil-rights action against the chief of police—as "mutineers."

*Id.* at 944.  This Court ordered reassignment because "it is unlikely that a judge who has expressed such an opinion of the plaintiffs on so inadequate a basis will be able to ignore the opinion he previously embraced or to erase any apprehensions that the plaintiffs would not be treated fairly on remand."  *Id.* at 944; *see also Latiolais v. Cravins*, 574 F. App'x 429, 437 (5th Cir. 2014) (reassigning because of "presiding judge's comments"); *Mata v. Johnson*, 210 F.3d 324, 333 (5th Cir. 2000) (reassigning case from Hughes, J., because of "court's remarks").

Here, too, it is highly unlikely that Judge Hughes "will be able to ignore the opinion he previously embraced or to erase any apprehensions that the plaintiffs would not be treated fairly on remand."  *Simon*, 825 F.2d at 944.  Since nearly the beginning, and even though the proceedings have never reached the merits, he has openly embraced Visa's view of the merits.  With respect to the FANF structure, he rejected outright the notion that the fixed fee is improperly coercive by simply ignoring the critical fact that Visa has market and monopoly power.  *See* ROA.1118 (opining that merchants are "not forced to pay" the fixed fee but rather "have a choice of what to buy"); ROA.1117 ("No, they're not [forcing merchants to pay]. They're pricing the product."); ROA.1201 ("They're not impairing [competition]. They're competing."); ROA.1501 ("So what?  They adapted to circumstances .… What you just told me is, Visa lowers its prices."); ROA.1503

("You've made metaphysical leap [by saying Visa is f]orcing merchants to [pay the FANF].").

With respect to the PAVD mandate, Judge Hughes insists that it enhances competition and is nothing more than permissible "integration" of Visa's signature and PIN debit networks. *See* ROA.1631 ("I know what they came up with. They competed."); ROA.1602 ("They compete for [placement on Visa-branded signature cards]."); ROA.1606-07 ("On their own cards they have integrated the operation."); ROA.1630 ("It is integration."); ROA.1472 (stating that issuers "don't have to" enable Visa's PAVD functionality and do so "voluntarily"); ROA.1588 ("It looks to me like Visa has an integrated deal.").

Judge Hughes' premature views on the merits are unsurprising given his general disdain for antitrust law and antitrust plaintiffs. He openly announced his belief that "there are more bad antitrust cases than any other single category," ROA.1125, that the *IBM* anti-tying case was "decided wrongly," ROA.1632, and that *Standard Oil* was decided wrongly. ROA.1590; *see also* ROA.1126 (referring to Standard Oil as a "so-called monopoly"). Visa cannot be a monopolist because, according to Judge Hughes, the "only real monopolies are ones supported by the government." ROA.1495. In light of these repeated, on-the-record comments, there is little doubt that Judge Hughes would "have substantial difficulty in putting out of his … mind previously-expressed views." *Little*, 602 F. App'x at 975.

## B. Reassignment Is Necessary To Preserve the Appearance of Justice.

Reassignment is necessary to "preserve the appearance of justice," which has been undermined by "the long delays, repeated errors, and cursory reasoning in the district court's opinions to date." *Id.* at 976. Despite ample opportunity and Pulse's pleas for progress, Judge Hughes failed to move this case past standing in the four years that it lingered in his court. The parties waited nine months for a one-sentence opinion on a motion to dismiss, then waited ten months for a summary-judgment opinion addressing essentially the same issue yet reaching the opposite result. In between, Judge Hughes repeatedly postponed hearings, *see, e.g.*, ROA.721-24, ROA.1064, and forced the parties to waste time and resources on useless exercises, *see, e.g.*, ROA.203, ROA.392-93, ROA.2443-2501.

These unnecessary delays have already caused this case to last longer than the *entire* Microsoft antitrust case, including trial and an *en banc* appeal. *See United States v. Microsoft Corp.*, 253 F.3d 34, 48 (D.C. Cir. 2001) (noting that case "proceeded from the filing of complaints through trial to appellate decision in a mere three years"). In a market as fast-moving as the debit network services market, and with the future of cutting-edge technologies like Pulse Pay Express hanging in the balance, these delays are inexcusable. Remanding this case back to Judge Hughes, who has a well-documented history of such delays, undoubtedly would undermine "the appearance of justice." *Little*, 602 F. App'x at 976.

## C. Reassignment Would Preserve Resources and Ensure Fairness.

While reassignment can often risk "waste and duplication," *id.* at 975, this is the rare case in which reassignment will *conserve* resources. After four years, this case remains stalled at the threshold. In that respect as well, this case is quite similar to *Little*, in which this Court held that reassignment would not create "waste and duplication out of proportion to any gain in preserving the appearance of fairness" because the case "sat for more than eight years without progressing past the public disclosure jurisdictional challenge." *Id.* at 976. Here, too, in four years this case has not even progressed past standing, which is just as much of a threshold issue as the FCA's public-disclosure bar. Not enough has happened to create any meaningful risk of duplication.

The lack of progress extends to discovery. Judge Hughes forbade all party discovery and sharply limited other discovery. Every time Pulse requested permission to obtain modest discovery from Visa, Judge Hughes refused—even going so far as to suggest that *Visa* should be permitted to seek discovery from *Pulse* before Pulse could seek any discovery from Visa. *See supra* pp.22-23. When Pulse requested permission to participate in the MDL discovery to both ensure fairness and limit the burdens on Visa, Judge Hughes refused—even though Visa had already obtained significant discovery from Pulse in the MDL. And when Pulse asked Judge Hughes to make use of the dead time between the summary-judgment briefing and

decision by allowing Pulse to at least *access* the MDL discovery Visa already had produced, he again refused. ROA.1082. Reassignment thus would not require any duplicative discovery efforts, as there has been hardly any discovery in the first place.

*     *     *

The four years spent in the district court are unfortunately "already on the balance sheet." *Latiolais*, 574 F. App'x at 437. This Court cannot restore the parties' lost time and resources, but it can ensure that no further time is wasted, and that this case finally starts moving toward a resolution. Absent reassignment, Pulse will be forced to return to a judge who has shown no inclination to provide Pulse a meaningful opportunity to pursue and prove its claims. While reversal would be a step in the right direction, only reassignment can ensure "that no further waste of time or assets, and no appearance of bias, will be allowed or countenanced." *Id.* But at a bare minimum, this Court should reverse and instruct the district court to allow Pulse to timely obtain meaningful discovery from Visa (including discovery produced in the MDL), as well as from issuers, merchants, debit networks, and other appropriate parties, and then to promptly set a trial date so that the parties can resolve the serious merits issues this case presents.

## CONCLUSION

This Court should reverse and order the case reassigned on remand.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
MICHAEL D. LIEBERMAN
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
(202) 879-5000
paul.clement@kirkland.com

*Counsel for Plaintiff-Appellant*

January 30, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that service will be made on opposing counsel by the CM/ECF system or by electronic mail.

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF COMPLIANCE

I certify:

1) This brief complies with the type-volume limitation Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), it contains 13,000 words as determined by the word counting feature of Microsoft Word 2016.

2) The required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13, the electronic submission is an exact copy of the paper submission, and the document has been scanned for viruses with Windows Defender, last updated January 17, 2019 and is free of viruses.

3) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

<u>s/Paul D. Clement</u>
Paul D. Clement