No. 18-20669

# In the United States Court of Appeals for the Fifth Circuit

---

PULSE NETWORK, L.L.C.,

*Plaintiff – Appellant,*

v.

VISA, INCORPORATED,

*Defendant – Appellee.*

---

On Appeal from the United States District Court for the
Southern District of Texas, Houston Division, Case No. 4:14-cv-3391

---

## BRIEF OF APPELLEE VISA INC.

---

Andrew S. Tulumello
Jacob T. Spencer
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

Mark R. Merley
Michael A. Rubin
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Allyson N. Ho
Bradley G. Hubbard
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2900

*Counsel for Appellee*

The undersigned counsel of record certifies that the following listed persons or entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiff – Appellant | Counsel for Plaintiff – Appellant |
|---|---|
| Pulse Network, LLC | Paul D. Clement<br>Erin E. Murphy<br>Michael D. Lieberman<br>Kevin M. Neylan<br>Anne M. Sidrys<br>Michael S. Becker<br>KIRKLAND & ELLIS LLP<br>1301 Pennsylvania Avenue, N.W.<br>Washington, DC  20004<br><br>Andrew G. Horne<br>William H. Pratt<br>KIRKLAND & ELLIS LLP<br>601 Lexington Avenue<br>New York, New York  10022<br><br>David J. Beck<br>Geoff A. Gannaway<br>Russell S. Post<br>BECK REDDEN LLP<br>1221 McKinney Street, Suite 4500<br>Houston, Texas  77010<br><br>Jennifer M. Selendy<br>SELENDY & GAY PLLC<br>1290 Avenue of the Americas, 17th Floor<br>New York, New York  10104 |

| | Richard I. Werder, Jr<br>Sami H. Rashid<br>Steig Olson<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, New York  10010 |
|---|---|
| **Defendant – Appellee** | **Counsel for Defendant – Appellee** |
| Visa Inc. | Allyson N. Ho<br>Bradley G. Hubbard<br>GIBSON, DUNN & CRUTCHER LLP<br>2100 McKinney Avenue, Suite 1100<br>Dallas, Texas  75201<br><br>Andrew S. Tulumello<br>Jacob T. Spencer<br>GIBSON, DUNN & CRUTCHER LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, DC  20036<br><br>Mark R. Merley<br>Michael A. Rubin<br>ARNOLD & PORTER KAYE SCHOLER LLP<br>601 Massachusetts Avenue, N.W.<br>Washington, DC  20001<br><br>Asim M. Bhansali<br>KWUN BHANSALI LAZARUS LLP<br>555 Montgomery Street, Suite 750<br>San Francisco, California  94111<br><br>John W. Keker<br>KEKER, VAN NEST & PETERS LLP<br>633 Battery Street<br>San Francisco, California  94111 |

| | Lee L. Kaplan<br>SMYSER KAPLAN & VESELKA, LLP<br>700 Louisiana Street, Suite 2300<br>Houston, Texas 77002 |
|---|---|

Respectfully submitted,

/s/ *Allyson N. Ho*
Allyson N. Ho
*Counsel of Record*

## STATEMENT REGARDING ORAL ARGUMENT

There is no need for oral argument. The district court correctly applied well-established Supreme Court precedent and basic principles of antitrust law to rule that Pulse lacks antitrust standing to challenge pro-competitive aspects of its rival's conduct. Accordingly, the Court should affirm without argument. But to the extent the Court would find argument helpful to dispel Pulse's hand-waving about purported procedural irregularities and other issues unrelated to the merits of the district court's ruling, Visa is happy to present argument.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons ................................................................ i

Statement Regarding Oral Argument ...................................................... iv

Table of Authorities ............................................................................... vii

Introduction ............................................................................................. 1

Issue Presented ....................................................................................... 3

Statement of the Case ............................................................................. 3

    I.    Factual Background .................................................................. 3

        A.    The Debit Card Industry Is Competitive ...................... 3

        B.    This Case Is The Latest Round Of 25 Years Of Litigation Brought By Pulse And Its Corporate Parent, Discover ............................................................. 5

        C.    The Durbin Amendment Changes The Competitive Dynamics Of The Debit Industry ............. 7

        D.    Visa Innovates In Response To The Durbin Amendment ................................................................. 10

        E.    Visa's Innovative Strategies Cause Pulse To Have To Compete .................................................................. 12

    II.    Course of Proceedings ........................................................... 16

        A.    Pulse Sues Visa .......................................................... 16

        B.    The District Court Grants Summary Judgment for Visa ............................................................................ 19

Summary of the Argument ..................................................................... 22

Standard of Review ................................................................................ 26

Argument ................................................................................................ 27

    I.    Pulse Cannot Carry Its Burden Of Demonstrating Antitrust Standing ................................................................ 27

A.  Antitrust Standing Ensures That Antitrust Law Protects Consumers—Not Competitors ...................... 27

B.  PAVD Deprived Pulse Of Exclusivity, Causing It To Compete For Transaction Volume By Lowering Fees .............................................................................. 31

C.  Visa's FANF Fee Structure Caused Pulse To Compete By Lowering Per-Transaction Fees ............. 38

D.  Pulse's Lack Of Success With Pulse Pay Express Is Neither Antitrust Injury Nor Injury-In-Fact Attributable To Visa's Conduct ................................... 43

II.  Reassignment Is Unnecessary .............................................. 55

Conclusion ............................................................................................ 59

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Atl. Richfield Co. v. USA Petrol. Co.*,
   495 U.S. 328 (1990) ................................................................ *passim*

*Barry Wright Corp. v. ITT Grinnel Corp.*,
   724 F.2d 227 (1st Cir. 1983) ..................................... 47, 48

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ........................................................... 35

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) .............................................. *passim*

*Cargill, Inc. v. Monfort of Colo., Inc.*,
   479 U.S. 104 (1986) .............................................. *passim*

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) ..................................... 49

*Discover Fin. Servs. v. Visa U.S.A. Inc.*,
   598 F. Supp. 2d 394 (S.D.N.Y. 2008) ...................... 6, 7

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
   123 F.3d 301 (5th Cir. 1997) ............................. *passim*

*Dr. Miles Med. Co. v. John D. Park & Sons Co.*,
   220 U.S. 373 (1911) ........................................................... 57

*Eastman Kodak Co. v. Image Tech. Servs.*,
   504 U.S. 451 (1992) ........................................................... 32

*Federal Baseball Club v. National League*,
   259 U.S. 200 (1922) ........................................................... 57

*Fedway Assocs. v. U.S. Treasury, Inc.*,
   976 F.2d 1416 (D.C. Cir. 1992) ..................................... 48

*Felder's Collision Parts, Inc. v. All Star Advert. Agency, Inc.*,
  777 F.3d 756 (5th Cir. 2015) ............................................................. 40

*Flood v. Kuhn*,
  407 U.S. 258 (1972) ........................................................................ 57

*FTC v. Procter & Gamble Co.*,
  386 U.S. 568 (1967) ........................................................................ 57

*Hayes v. Solomon*,
  597 F.2d 958 (5th Cir. 1979) ............................................................. 49

*Jayco Sys., Inc. v. Savin Bus. Machs. Corp.*,
  777 F.2d 306 (5th Cir. 1985) ....................................................... 50, 54

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) ............................................................................ 33

*Kohler v. Englade*,
  470 F.3d 1104 (5th Cir. 2006) ........................................................... 58

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ........................................................................ 57

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .................................................... 31, 37, 42, 48

*Med. Ctr. Pharmacy v. Holder*,
  634 F.3d 830 (5th Cir. 2011) ............................................................. 58

*Sanger Ins. Agency v. HUB Int'l, Ltd.*,
  802 F.3d 732 (5th Cir. 2015) ............................... 26, 49, 50, 54

*SCFC ILC, Inc. v. Visa USA, Inc.*,
  36 F.3d 958 (10th Cir. 1994) ....................................................... 5, 6

*Smith v. Reg'l Transit Auth.*,
   827 F.3d 412 (5th Cir. 2016) .................................................................. 26

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961) .............................................................................. 47

*Turner v. Baylor Richardson Med. Ctr.*,
   476 F.3d 337 (5th Cir. 2007) .................................................................. 51

*United States v. Anthem, Inc.*,
   855 F.3d 345 (D.C. Cir. 2017) ................................................................ 57

**Statutes**

15 U.S.C. § 15(a) ........................................................................................ 27

15 U.S.C. § 1693o-2 ............................................................................... 7, 32

Dodd-Frank Wall Street Reform and Consumer Protection
   Act,
   Pub. L. No. 111-203, 124 Stat. 1376 (2010) ............................................ 7

**Regulation**

12 C.F.R. § 235.7 ......................................................................................... 7

**Rule**

Fed. R. Civ. P. 56 ...................................................................................... 20

# TABLE OF AUTHORITIES
## (continued)

Page(s)

## Other Authorities

Phillip E. Areeda et al., *Antitrust Law* (4th ed. 2014) .................... *passim*

Robert H. Bork, *Antitrust and Monopoly: The Goals of Antitrust Policy*,
57 Am. Econ. Rev. 242 (1967) ............................................................... 57

Frank H. Easterbrook, *The Limits of Antitrust*,
63 Tex. L. Rev. 1 (1984) ....................................................................... 57

George L. Priest, *Rethinking the Economic Basis of the Standard Oil Refining Monopoly: Dominance Against Competing Cartels*,
85 S. Cal. L. Rev. 499 (2012) .............................................................. 57

## INTRODUCTION

The most fundamental principle of antitrust law—that it protects competition, not competitors—resolves this case and requires affirmance. That principle is embodied in the requirement of antitrust standing, which prevents competitors from using antitrust litigation to obtain in court what they cannot achieve in the marketplace.

Antitrust standing performs this important task by "ensur[ing] that a plaintiff can recover only if [its] loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 344 (1990). Permitting a competitor to sue based on harm attributable to aspects of a rival's behavior that *increased* competition would frustrate the very purposes of antitrust law— expanding consumer choice, lowering prices, and protecting competition, not competitors. *See Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 306 (5th Cir. 1997).

Pulse ignores this fundamental principle, the undisputed facts, its own concessions, and binding precedent—instead, it repeats over and over again that courts must assume harm to competition in assessing antitrust standing. True enough—and the district court did so. But what

Pulse seeks, this Court cannot do—assume that Pulse's alleged injury was caused by some *anti*-competitive *aspect* of Visa's conduct. Here, there can be no dispute that if Pulse suffered harm at all, it was caused by *pro*-competitive aspects of Visa's conduct. Allowing this litigation to continue would not only eviscerate the antitrust-standing requirement but also incentivize competitors to use the specter of treble-damages litigation under the Sherman Act—rather than innovation—to compete in the marketplace.

At best, Pulse's request for reassignment on remand is a distraction from its lack of antitrust standing. At worst, it is an opportunistic attempt to end-run a series of discovery orders Pulse decided not to appeal. Either way, it is meritless. Pulse lacks antitrust standing, summary judgment is proper, and affirmance is required.

Whether summary judgment is proper because Pulse cannot show antitrust standing, as Pulse was harmed, if at all, by *pro*-competitive aspects of Visa's conduct.

## STATEMENT OF THE CASE

### I.    Factual Background

### A.    The Debit Card Industry Is Competitive.

There are five parties involved in a typical debit card transaction: the merchant, the merchant's bank (the "acquirer"), the consumer, the consumer's bank (the card "issuer"), and the debit-network provider:



ROA.179–80.

Visa and Pulse both provide debit network services. They build and maintain networks that link merchants (through acquirers) to consumers (through issuers). Issuers decide which debit networks to enable on a debit card. ROA.8555. And merchants (or acquirers) decide which debit network to route a transaction over (of the networks they accept and that are enabled on the card). ROA.8555–56.

There are two steps to a typical debit card purchase. *First*, the consumer swipes (or inserts) a debit card, and the merchant transmits authentication and payment information to the issuer via a debit network. ROA.29–30, 179–80, 8555. *Second*, the issuer approves or declines the transaction and sends its response back to the merchant, which then completes the transaction or notifies the consumer that the transaction was declined. ROA.30, 179–80, 8555.

Historically, there were two types of debit networks that corresponded with two different methods for authenticating debit transactions. ROA.180–81. When customers entered a Personal Identification Number ("PIN"), their transactions would be routed through a PIN network. ROA.8555. And when customers used a signature, their transactions would be routed through a "signature"

network. ROA.8555. Pulse's network was historically a PIN network. ROA.181. Visa offered both a PIN network (called Interlink) and a "signature" network (called Visa Debit). ROA.3223. Debit cards generally enable one "signature" network (Visa Debit, for Visa-branded cards) and at least one PIN network. ROA.32.

Visa and Pulse and other debit-network providers compete with each other on both sides of a two-sided market. ROA.8555. They compete to have issuers enable their networks on particular debit cards and to have merchants route transactions over their networks. ROA.8555–56. To do so, network providers must balance their fee structures, rebates, incentives, and agreement terms to remain attractive to both sides of the market. ROA.33, 8556.

## B. This Case Is The Latest Round Of 25 Years Of Litigation Brought By Pulse And Its Corporate Parent, Discover.

In the early 1990s, Discover (Pulse's parent company) applied for membership in Visa—which was then an association of banks that issued payment cards—to take advantage of Visa's superior brand recognition and acceptance by merchants, while still competing with Visa as a network provider. ROA.166 (citing *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 961 (10th Cir. 1994)). When Visa rejected Discover's

application, Discover sued. ROA.166 (citing *SCFC ILC*, 36 F.3d at 961). The Tenth Circuit reversed a jury verdict in favor of Discover on its Sherman Act claims because Discover presented "no evidence" that Visa's challenged conduct "harm[ed] consumers" and "[t]he Sherman Act ultimately must protect competition, not a competitor." *SCFC ILC*, 36 F.3d at 971–72. "'[W]hatever currents [Discover] imagines Visa [ ] has wrongly created,'" the Tenth Circuit concluded, could "'be better corrected by the marketplace itself.'" ROA.166 (second alteration in original) (quoting *SCFC ILC*, 36 F.3d at 972).

Undeterred, Discover sued Visa again in 2004. ROA.166. Part of Discover's suit was about credit cards—it settled that part in 2008. ROA.166. But because it had recently acquired Pulse, Discover's suit was also about debit cards: Discover alleged, among other things, that Visa violated the antitrust laws by entering into long-term, exclusive deals with issuers and also by offering "'large, unprofitable payments to certain banks to encourage them to convert to Interlink and stop dealing with competing debit networks,'" such as Pulse. ROA.166–67 (citing *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 405 (S.D.N.Y. 2008)).

The court ruled that none of Visa's agreements foreclosed Discover from competing, and that Discover could not complain about Visa offering lower, non-predatory prices to win business. ROA.167 (citing *Discover*, 598 F. Supp. 2d at 405–06).

## C. The Durbin Amendment Changes The Competitive Dynamics Of The Debit Industry.

In 2010, an eleventh-hour amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act by Senator Durbin altered the competitive dynamics of the debit-card industry. ROA.46–47; *see* Dodd-Frank, Pub. L. No. 111-203, § 1075, 124 Stat. 1376, 2068 (2010) (codified at 15 U.S.C. § 1693o-2).

Among other things, the Durbin Amendment requires issuers to enable at least two unaffiliated networks on each debit card. 15 U.S.C. § 1693o-2(b)(1)(A); 12 C.F.R. § 235.7. And it gives merchants (or acquirers) carte blanche to select which network, among those enabled by the issuer, to route its debit transactions over. 15 U.S.C. § 1693o-2(b)(1)(B).

The Durbin Amendment thus eliminated debit cards that enabled only a single provider's networks. For example, a Visa-branded debit card that enables Visa Debit must also enable at least one non-Visa

network (usually, a PIN network).  ROA.47.  As a result, the Durbin Amendment precludes Visa from competing with other network providers to be the exclusive option for routing PIN-authenticated transactions on Visa-branded debit cards.  ROA.47, 3225, 8556.

But the Durbin Amendment permits debit networks (other than Visa) to compete with each other to be the unaffiliated network on Visa-branded cards—even if that means a non-Visa network would be the *only* network enabled on those cards capable of processing PIN-authenticated transactions.  ROA.51, 3225.

That was precisely Pulse's post-Durbin Amendment strategy—it attempted to become the exclusive PIN network on Visa- and Mastercard-branded cards by convincing issuers to disable all other PIN networks (including Visa's Interlink network) on particular debit cards.  ROA.3226–30.  After Pulse secured exclusive placement on a debit card, transactions would be routed to Pulse whenever a consumer used a PIN during a debit-card transaction.  ROA.3227.

███████████████████████████████████████████

█████████████████████████████████.  For  almost  ███████████

██████████████████████████████████████████,  the

8

merchant had no other PIN network choice.  ROA.3227–28.  ████

████████████████████████: ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████.  ROA.3228.

Although Pulse says (at 19) that the Durbin Amendment should

have "reduced fees for merchants and issuers," ████████████████

████████████████████████████████████████████████████████

████████████████.  ROA.3229–30.  This meant that Pulse often had

the ████████████████ network fees for PIN-authenticated

transactions, and (not surprisingly) ████████████████████████

████████████████████████████████████████████████████████

████████████████ ROA.3232–35.

But post-Durbin Amendment, Pulse generally *lost* the competition

to be the unaffiliated network on Visa-branded debit cards—especially to

Mastercard's Maestro network, which was particularly successful among

the largest issuers.  ROA.3264–65.  Initially, Pulse's biggest success in

this competition was with ████████████—████████████████

ROA.3227, 3264.  In 2015, however, competitor ████████ convinced

██████████████ to remove Pulse from many of its cards, causing a dramatic decline in Pulse's overall volume of debit-card transactions. ROA.3265–66.

### D. Visa Innovates In Response To The Durbin Amendment.

Visa recognized that Interlink (its PIN network) was likely to lose significant volume in the wake of the Durbin Amendment because Interlink could no longer compete to be the exclusive PIN network on any Visa-branded debit card—even as other PIN networks *could* continue to compete with each other for exclusivity. ROA.7022. Visa responded by implementing an innovative competitive strategy that had a number of distinct components.

*First*, Visa adopted its PIN-Authenticated Visa Debit ("PAVD") program for issuers in April 2012. The PAVD program requires issuers to permit PIN-authenticated debit transactions to be processed over Visa Debit (which historically had been Visa's "signature" network). ROA.3230. PAVD is optional for merchants. ROA.3230–31. Once enabled, PAVD ensures that merchants have at least two routing choices for virtually all PIN-authenticated transactions on Visa-branded debit cards. ROA.3231. Even if the issuer enables only one PIN network on

the card, PAVD still gives merchants the option to route their PIN-authenticated transactions through Visa Debit. ROA.3231. That, in turn, means that even if Pulse—or another non-Visa PIN network—is the exclusive PIN network on a Visa-branded card, it still must compete with PAVD to route all PIN-authenticated transactions. ROA.3231.

*Second*, in April 2012, Visa restructured its network fees by introducing the Fixed Acquirer Network Fee ("FANF"), which included a monthly fee per merchant location. ROA.3249. The FANF is paid when a merchant accepts Visa debit cards—and it varies based on several factors. ROA.3249. At the same time, Visa lowered its per-transaction fees and increased the incentives for merchants and acquirers to route debit transactions through Visa's networks. ROA.3232, 3248–49. Many debit-network providers—including Pulse—have similarly restructured their network fees by adopting per-location fees and lowering per-transaction fees. ROA.3249–50.

*Third*, Visa offered volume-based fee reductions to merchants (and their banks)—generally offering rebates, discounts, and other incentives if the merchant or acquirer routes a certain number of transactions through Visa's network. ROA.3250, 3262–63. ████████████

█████████████████████████████████████████

███████.   ROA.3250–51.   For example, when a ██████ affiliate terminated its merchant agreement with Visa in exchange for lower pricing from ████████████, ROA.3254, and when ████████ ended its acquirer arrangement with Visa ██████████████████████ ████████, ROA.3253–54, 3257, neither ██████ nor ████████████ ████████.   ROA.3251–52.

## E.   Visa's Innovative Strategies Cause Pulse To Have To Compete.

A few days after PAVD took effect, Pulse wrote: ██████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████ ROA.3554  (emphasis  added). Handwritten notes on that same internal email acknowledged that

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████ ROA.3554 (emphasis added).  Those handwritten notes also reflect that Pulse was already ███████████████████████████████████████ ████████.   ROA.3554.

Two months later, a Pulse performance analysis warned that

███████████████████████████████████████████████████

███████████████████████████████████████████████████

ROA.3557 (emphasis added). As Pulse told the district court, PAVD

███████████████████████████████████████████████████

███████████████████████████████████████████████████

ROA.4787.

For most merchants, routing PIN-authenticated transactions

through PAVD instead of Pulse reduced network fees by upwards of ██

███████ compared to what Pulse was charging when it had exclusivity

over PIN-authenticated transactions. ROA.3241. Pulse initially

responded by ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████. ROA.3235–

39, 3242–43, 3247–48.

But Pulse lost significant business as other merchants selected

Visa's lower per-transaction fees. ROA.3234–35, 3237–39. According to

Pulse, ██████████████████████████████████████████████

███████████████████████████████████████████████████

ROA.4786.  After a year, Pulse ██████████████████████████

████████████████████████████████████████████████████.

ROA.3239–40.

Even so, merchants continued to use the choice offered by PAVD █

████████████████████████████████████████████████████

████████████████████████████████████████.  ROA.3235–37,

3239, 3242–43, 3248.

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████.  ROA.3232–33, 3241–42.

██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████.  ROA.3248*; see

*also* ROA.1757 (████████████████████████████████████

████████████████████████████████████████████

██████████████████).

Pulse's share of overall debit volume remained fairly stable

between ██████████████████████████████████████████

███████████████████████████████. ROA.2406. According to its estimates, Pulse captured ██████████████████████████████████████████████████. ROA.2406. That share ██████—*despite* PAVD and FANF—to █████████ ██████████████████. ROA.2406. In 2013, Pulse's share █████████ ████████████████████████████████████. ROA.2406. ███████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████. ROA.2406.

But in 2015, Pulse suffered a ██████████ decline to its business— ████████████████████████████████████████████████████ ██████████████████. ROA.2406. Using Pulse's numbers, ████████████████████████████████████████████████████ ███████—starting three years after Visa's challenged conduct began.

That decline occurred when the ████████████████████████ ████████████████████████████████████████████. ROA.3265. Pulse publicly reported that its transaction dollar volume dropped 15 percent within a year. ROA.954. And ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████. ROA.3266.

The timing could not have been worse for Pulse, which had just launched Pulse Pay Express as a "PINless" alternative to Visa's and Mastercard's "signature" networks.  ROA.3261–62, 4963.  (Pulse Pay Express is "PINless" because it allows non-PIN transactions to be routed over Pulse's network.  ROA.3261–62, 4963.)  Pulse claims that issuers and merchants were not interested in investing the necessary resources to build the infrastructure that Pulse's new offering required.  ROA.4964, 4966–67.

Pulse attributes that tepid interest to the ███████ decline in its PIN volume—a decline that Pulse says caused it to lack the "scale and [market] relevance" necessary to generate interest in its new venture.  ROA.4704–05, 4716–17, 4780.  Pulse also says that Visa offered fee discounts on "signature" debit volume to certain issuers (in addition to merchants), in part as a competitive response to Pulse's introduction of Pulse Pay Express.  *See* Pulse Br. 19.

## II.    Course of Proceedings

### A.    Pulse Sues Visa.

Pulse sued Visa in 2014, alleging that Visa's post-Durbin Amendment strategies violated various federal and state antitrust laws.

ROA.20–111. Visa moved to dismiss in January 2015, arguing (1) that Pulse lacked antitrust standing to complain about supposedly higher overall network fees because Pulse does not pay those fees; (2) that Pulse lacked antitrust injury because the harms it alleged from PAVD (loss of exclusivity) and the FANF fee structure (lower per-transaction fees) resulted from *increased* competition; and (3) that Pulse's vague allegations about Visa's volume-discount agreements failed to state a claim. ROA.157–78.[1]

During a lengthy hearing on Visa's motion to dismiss, the district court probed Pulse's theories, focusing on whether Pulse could demonstrate antitrust standing and injury. ROA.1447–1542.[2] After the

---

[1] After an initial conference, the district court requested basic background information about the debit-card industry from the parties—including their respective market shares and fee structures. ROA.203. Pulse now derides (at 54) that request as a "useless exercise[ ]," although it failed to voice any contemporaneous objection below. Pulse even relied on data from another "useless exercise"— comparing the fixed fees under FANF to those under Pulse's fee structure—in support of its opposition to Visa's motion for summary judgment, so at least it got some benefit from what it now calls (at 54) a "waste" of "time and resources." *Compare* Pulse Br. 54 (describing the district court's May 6, 2016 Order requesting additional data as a "useless exercise"), *with* ROA.4764 (citing responses to the May 6, 2016 Order in opposing Visa's summary judgment motion).

[2] Pulse presents (at 52–53) a few of the court's questions and remarks from the hearing out of context to assert that the court had prejudged the case in Visa's favor from the start. (citing ROA.1472, 1495, 1501, 1503). For example, Pulse complains about the court's off-the-cuff remark that "[t]he only real monopolies are ones supported by the government." ROA.1495. But the court later repeated Pulse's

hearing, the court gave Pulse an opportunity to amend its original complaint. ROA.283. A month later, Pulse declined to do so. ROA.303.

Even though Pulse declined the district court's offer to amend the complaint, the court *denied* Visa's motion to dismiss. ROA.318; *contra* Pulse Br. 20 (asserting that the district court "decided *from the start* that Visa had done nothing wrong—or at least had done nothing that the court thought should be wrong") (emphasis altered).

In June 2016—after several discovery-related hearings—Pulse moved to participate in discovery in multidistrict antitrust litigation pending in the Eastern District of New York against Visa (and other defendants). ROA.404. Visa opposed Pulse's motion, emphasizing that the multidistrict litigation began in 2005—more than half a decade before the Durbin Amendment was passed and the pricing strategies at issue came into play—and explaining that there was no need to delay this case for more than a year so that Pulse could participate in the hundreds

---

contention that Visa had "buil[t] . . . monopoly power." ROA.1500. And the court's comment about Pulse's "metaphysical leap"—that Visa "[f]orc[ed] merchants to use" FANF—was part of an extended back-and-forth where the court asked (in the words of Pulse's counsel) "great questions" in an effort "to learn this business." ROA.1502–07; *see also* ROA.1472–73. The full, 96-page hearing transcript does not support Pulse's characterization that the court had prejudged the case in Visa's favor—nor does the fact that the court *denied* Visa's motion to dismiss.

of depositions of merchants, banks, and payment networks expected in the multidistrict litigation. ROA.2502.

After yet another lengthy hearing on discovery, the court agreed with Visa that allowing Pulse to participate in the multidistrict litigation discovery would be improper. ROA.645. The court did, however, permit Pulse to request records and depositions from the merchant (████) and acquirer (████) that Pulse identified as the most critical. ROA.647, 660, 673. Though Pulse complained that it was not getting the discovery it needed, it failed time and time again to explain why it needed more discovery than it already had to show antitrust standing—beyond generic assertions that broad discovery is typical in antitrust cases. ROA.1314; *see also* ROA.1145–47, 1163–67, 1170–71, 1174–75, 1177, 1195–96, 1202, 1634, 1636–39, 1781, 1789, 1806.

## B. The District Court Grants Summary Judgment for Visa.

Visa moved for summary judgment because the undisputed facts showed both that Pulse lacked antitrust standing and that it could not prove that Visa's conduct violated the antitrust laws. ROA.3179–3221. Pulse—which now complains (at 55) that this case "has not even progressed past standing"—asked the district court to defer any decision

on the merits of its antitrust claims until after the court decided whether it had antitrust standing. ROA.972. Over Visa's objection, ROA.983–84, the court agreed to postpone ruling on the merits of Pulse's case. ROA.990.

Pulse opposed summary judgment, arguing that disputed issues of material fact precluded ruling for Visa on standing and antitrust injury. ROA.4689–4729. Pulse also filed an alternative motion under Rule 56(d), asking the court to defer or deny Visa's summary judgment motion to allow Pulse to obtain additional discovery. ROA.8457. But Pulse did not identify any unanswered factual question that was material to whether Pulse had sustained antitrust injury or suffered injury-in-fact—the *only* issues before the court after it granted Pulse's request to defer consideration of the merits—much less a question that would require additional discovery. ROA.8457–60, 8495–8502. Consequently, the district court denied Pulse's Rule 56(d) motion "to defer summary judgment to conduct unspecified additional discovery." ROA.1099.

In August 2018, the district court granted Visa summary judgment, holding that Pulse lacked antitrust standing to sue. ROA.8561. As required by this Court's ruling in *Doctor's Hospital*, 123 F.3d 301, the

court assumed "that Visa's conduct violated the antitrust laws." ROA.8558.

But the court explained that Pulse could sue only if it had sustained "the type of injury that antitrust law addresses" *and* that injury "flow[ed] from Visa's conduct." ROA.8558 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977)). The district court recognized that "[c]onduct that violates the antitrust laws might have different results for different actors. The same act could reduce competition to some and increase competition to others." ROA.8558 (citing *Atl. Richfield*, 495 U.S. 328).

The court determined that Pulse's difficulties in launching Pulse Pay Express were not injury-in-fact proximately caused by Visa's conduct. *See* ROA.8559. And the court concluded that Pulse could not show antitrust injury, because its lost transaction volume and revenue were not caused by any anti-competitive aspect of Visa's conduct. ROA.8560.

Pulse, the court reasoned, "has had to offer lower pricing and more generous incentives to win merchant business" in response to Visa's conduct, but that was because "[t]o Pulse, Visa is an additional

competitor." ROA.8561. There was no reason to bend the antitrust standing requirements, the court added, because other market participants could bring—and in fact have brought—antitrust suits against Visa challenging PAVD and FANF. ROA.8561.

## SUMMARY OF THE ARGUMENT

Antitrust standing plays a vital role in ensuring that a plaintiff's suit serves the fundamental purposes of antitrust law—to increase consumer choice, to lower prices, and, ultimately, to protect competition, not competitors. The district court properly concluded that Pulse's suit is inimical to those purposes. Pulse was injured—if at all—only by aspects of Visa's alleged conduct that increased competition as to Pulse.

A rival may not bring an antitrust claim merely because it suffered an injury caused by a competitor's alleged antitrust violation. Instead, the rival must show that its injuries were caused by an *anti*-competitive aspect of its competitor's conduct *and* that they are the sort of injuries that the antitrust laws were designed to prevent. "At its most fundamental level, the antitrust injury requirement precludes any recovery for losses resulting from competition, *even though such competition was actually caused by conduct violating the antitrust laws*."

2A Phillip E. Areeda et al., *Antitrust Law* ¶ 337a, at 102 (4th ed. 2014) (emphasis added).

As the Supreme Court has explained, conduct that violates the antitrust laws may have different effects on different participants in the market—it may reduce competition for some, even as it increases competition for others. *See Atl. Richfield*, 495 U.S. at 344. Permitting rivals to bring antitrust suits when they are injured by competition-*increasing* aspects of a competitor's behavior would harm competition and consumers.

That is precisely what Pulse is attempting to do here. *First*, Pulse concedes that it is supposedly harmed by PAVD only because PAVD prevents it from securing exclusive placement on Visa-branded cards. But loss of exclusivity is injury *from competition*; it is not antitrust injury.

According to Pulse, PAVD is an anti-competitive tying arrangement that results in higher fees for issuers. But Pulse does not pay those fees and cannot suffer any injury from PAVD on the issuer side of the market. Rather, Pulse's asserted injury stems from having to compete with PAVD on the merchant side of the market. PAVD ensures that merchants have a choice to route PIN-authenticated transactions away from Pulse,

causing Pulse to compete for transaction volume and merchant-side revenue. In Pulse's own words: ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

ROA.3554. Having to compete is the *opposite* of antitrust injury.

*Second*, Pulse contends that the FANF fee structure is anti-competitive because it allegedly increases network fees for merchants. Even if that were true, it would not injure Pulse, because Pulse does not pay the FANF. Rather, the FANF fee structure supposedly injures Pulse because it causes Pulse to compete against Visa's lower per-transaction fees. But Pulse does not allege that those lower fees are predatory, and it is black-letter law that a competitor's injuries flowing from non-predatory price cuts cannot constitute antitrust injuries. *See*, *e.g.*, *Alt. Richfield*, 495 U.S. at 340–41 ("When prices are not predatory, any losses flowing from them cannot be said to stem from an *anticompetitive* aspect of the defendant's conduct.").

*Third*, Pulse's difficulty in launching Pulse Pay Express is neither antitrust injury nor injury-in-fact caused by any anti-competitive aspect of Visa's conduct. Pulse says (at 34) that it lacked the "scale and

relevance" it needed to persuade issuers and acquirers to invest in its new product. To the extent that it lacked the necessary scale and relevance because PAVD and the FANF fee structure caused it to compete for transaction volume and lower its per-transaction fees, its injury is not antitrust injury.

And to the extent that Pulse blames Visa's volume-discount agreements with merchants, acquirers, and issuers for its troubles, it has never articulated a coherent and cognizable theory of how those agreements violated the antitrust laws, and thus cannot show that its asserted injury stemmed from some anti-competitive aspect of those agreements.

Moreover, even if Pulse could show antitrust injury with respect to Pulse Pay Express, that injury was not caused by Visa. The undisputed facts demonstrate that Pulse suffered a ███████ decline in its share of debit-network transactions years after Visa's post-Durbin Amendment strategies went into effect when Pulse's ███████ decided to replace Pulse with ███████ on a great many of the issuer's debit cards. That ███████ decline, according to Pulse, made it ███████ for Pulse Pay Express to succeed at launch. Because that "obstacle[ ]" was

entirely "unrelated to the alleged anticompetitive conduct," Pulse lacks injury-in-fact sufficient to support antitrust standing. *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 740 (5th Cir. 2015).

Because this Court should affirm the district court's judgment, it need not address Pulse's argument that this case should be reassigned to a different judge. But in all events, that argument is meritless. Among other reasons, Pulse's assertion that the district court prejudged this case from the start cannot be squared with the court's denial of Visa's motion to dismiss. And despite Pulse's complaints about the district court's discovery management, Pulse has abandoned any challenge to any of the court's discovery orders.

The district court's judgment was correct and should be affirmed.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo. *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016). "Summary judgment is proper where there is no genuine dispute of material fact, and a party is entitled to judgment as a matter of law." *Id.*

## I. Pulse Cannot Carry Its Burden Of Demonstrating Antitrust Standing.

### A. Antitrust Standing Ensures That Antitrust Law Protects Consumers—Not Competitors.

"[T]he antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986). To recover under Section 4 of the Clayton Act, 15 U.S.C. § 15(a), therefore, an antitrust plaintiff must show "1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997). This antitrust "standing inquiry" is necessary to "ensure[ ] that the plaintiff's demand for relief ultimately serves the purposes of antitrust law to increase consumer choice, lower prices and assist competition, not competitors." *Id.* at 306.

Antitrust plaintiffs "must prove more than injury causally linked to an illegal presence in the market." *Brunswick Corp. v. Pueblo Bowl-O-*

*Mat, Inc.*, 429 U.S. 477, 489 (1977).  Rather, they "must prove *antitrust injury*," which requires that the alleged injury must be *both* "injury of the type the antitrust laws were intended to prevent *and* [injury] that flows from that which makes defendants' acts unlawful." *Id.* (second emphasis added).  This requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs." *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 342 (1990).

Pulse correctly notes (at 1–2, 26, 37, 39, 42–44, 47, 50) that in assessing antitrust injury, courts should begin by "assum[ing] an antitrust violation has occurred." *Doctor's Hosp.*, 123 F.3d at 306; *see also* ROA.8558 ("Assuming but not deciding that Visa's conduct violated the antitrust laws, the court must decide whether Pulse was injured."). But Pulse ignores that antitrust violations "may have three effects, often interwoven:  In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition." *Atl. Richfield*, 495 U.S. at 343–44.  "The antitrust injury requirement ensures that a plaintiff can recover

only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Id.* at 344.

That requirement thwarts lawsuits like this one, where "a rival may allege an antitrust violation by its rival(s) not to protect competition but to protect itself from competition." 2A Phillip E. Areeda et al., *Antitrust Law* ¶ 348a, at 231 (4th ed. 2014) ("Areeda"). If "the rival is injured in fact" by aspects of the defendant's behavior that *increase* competition, the rival must be denied standing, because "protecting rivals from greater competition or efficiency is inimical to the purpose of antitrust law." *Id.* "At its most fundamental level, the antitrust injury requirement precludes any recovery for losses resulting from competition, *even though such competition was actually caused by conduct violating the antitrust laws*." *Id.* ¶ 337a, at 102 (emphasis added).

Pulse says (at 50) that "the decision below simply cannot stand" because "Pulse is a direct competitor of Visa's that has suffered unquestioned harm from Visa's post-Durbin conduct—conduct that is anti-competitive, but in all events must be assumed anti-competitive at this stage." (emphases omitted). But "courts are properly skeptical of

many rivals' suits" because rivals have "an incentive to use an antitrust suit to delay their [competitors'] operations or to induce them to moderate their competition"—motives that are inimical to antitrust law. Areeda ¶ 348a, at 231–32. For that reason, the Supreme Court has frequently denied antitrust standing to direct competitors claiming injury from a rival's allegedly anti-competitive conduct. *See*, *e.g.*, *Atl. Richfield*, 495 U.S. at 328; *Cargill*, 479 U.S. at 113–17; *Brunswick*, 429 U.S. at 488–89.

The district court properly did so here. Pulse cannot bring an antitrust suit based on its asserted injuries from PAVD or the FANF fee structure, because the undisputed facts demonstrate that Pulse's asserted injuries flow from competition-*increasing* aspects of those programs. *See Atl. Richfield*, 495 U.S. at 344.

PAVD prevented Pulse from being the *exclusive* option for a merchant to route PIN-authenticated transactions on Visa-branded debit cards, and Visa's lower per-transaction fees adopted alongside FANF caused Pulse to *compete* by lowering its own per-transaction fees. Nor can Pulse bring an antitrust suit based on the difficulties it had launching Pulse Pay Express, because it cannot show that those

difficulties were proximately caused by any anti-competitive aspect of Visa's conduct. *See Doctor's Hosp.*, 123 F.3d at 305.

### B. PAVD Deprived Pulse Of Exclusivity, Causing It To Compete For Transaction Volume By Lowering Fees.

According to its own brief (at 42–43), "Pulse is harmed" by PAVD "because Pulse does not obtain exclusive placement" on Visa-branded debit cards. That undisputed fact entitles Visa to summary judgment because Pulse's loss of exclusivity cannot constitute antitrust injury, as the district court correctly held: "[A]s far as Pulse and other PIN networks are concerned, [PAVD] has injected another network through which merchants . . . can route PIN transactions." ROA.8560.

1. As it did below, Pulse asserts (at 42) that the anti-competitive effect of PAVD is on issuers. PAVD, it says (at 41–42), is a "tying arrangement that impairs competition on the issuer side of the market, resulting in higher issuer-side network fees." *See* ROA.106. But Pulse does not have standing to complain about issuer fees, because it does not pay them. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986) (conspiracy to charge supracompetitive prices cannot injure "competitors, [who] stand to gain from any conspiracy to

raise the market price"); *see also* ROA.1473 (Pulse's counsel conceding that "[w]e're not here speaking for the issuer").

Although PAVD's allegedly anti-competitive *effect* is on the issuer side of the market, it does not cause *Pulse* any injury—much less any antitrust injury—on that side of the market. An unlawful tying arrangement can have anti-competitive effects on a rival by preventing a purchaser from buying the tied product from the rival because it has to buy that product from the defendant. *See* Areeda ¶ 348, at 241 & n.44 (citing *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992)). But the Durbin Amendment requires issuers to enable at least one unaffiliated (i.e., non-Visa) debit network on every Visa-branded debit card, in addition to any of Visa's networks. 15 U.S.C. § 1693o-2(b)(1)(A).

As a result, PAVD cannot reduce the demand by issuers for unaffiliated networks on Visa cards; it simply ensures that issuers enable Visa's own PIN-authenticated functionality on every Visa card. Pulse can still compete with Star, Mastercard's Maestro network, and the other unaffiliated networks for placement on every Visa-branded debit card— a competition mandated by law in which Visa *cannot* compete and which is independent of PAVD.

Thus, even assuming that Visa "'forced'" issuers "to buy a product"—PIN-authentication over Visa's network—that they "would not have otherwise bought," that supposed tie does not injure Pulse, "because *no* portion of the market [for issuers] which would otherwise have been available to other [debit networks] has been foreclosed." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984) (emphasis added).

2.     Instead, Pulse's asserted injuries from PAVD stem from the merchant side of the market—where PAVD has *increased* competition—precisely *because* of that increased competition.

Pulse concedes (at 42–43) that "because issuers must enable PAVD or Interlink and are therefore prevented from entering into an exclusive deal with Pulse, Pulse loses out on the transaction volume it would have secured if it had obtained exclusive placement"—that is, Pulse "lose[s] merchant routing priority to Visa." By itself, the disconnect between Pulse's alleged injury (i.e., lost routing volume and merchant-side revenue) and the claimed anti-competitive effect of PAVD (i.e., supposedly higher issuer fees) demonstrates that Pulse's asserted injury from PAVD is not antitrust injury. *See Brunswick*, 429 U.S. at 489.

The competition-increasing effects of PAVD on Pulse remove any doubt. Without PAVD, Pulse could try to persuade issuers to make it the exclusive network for PIN-authenticated transactions on Visa-branded debit cards. For those transactions, merchants would be unable to take advantage of Visa's lower per-transaction fees for PIN-authenticated transactions. And Pulse would be able to earn more revenue from fewer PIN-authenticated transactions at higher per-transaction fees█████████ ██████████████████████. *See* ROA.3227–28, 3232–35.

With PAVD, however, Pulse is █████████████████████████ ████████████████ for every transaction on Visa-branded cards. ROA.3557. Pulse's own words say it best: ███████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ROA.3554. With PAVD, █████████████████████████████████ ████████████████████ ROA.3554.

Merchants use that increased choice to negotiate lower fees ████ ████. *See*, *e.g.*, ROA.3403 (█████████████████████████████████ ████████████████████████████████████████████████████████ ██████████). In sum, the "loss of PIN debit volume and revenue" that Pulse

suffers from PAVD, Pulse Br. 39, flows from increased choice, lower prices to merchants, and increased competition for routing of PIN-authenticated transactions—precisely the competition-increasing effects that antitrust law is designed to promote, not punish. *See*, *e.g.*, *Doctor's Hosp.*, 123 F.3d at 306.

3. Pulse's loss of desired exclusivity is the *opposite* of antitrust injury. Pulse has been "depriv[ed] . . . of the benefits of increased concentration," and accordingly, seeks damages "designed to provide [it] with the profits [it] would have realized had competition been reduced." *Brunswick*, 429 U.S. at 488. "The antitrust laws, however, were enacted for 'the protection of competition not competitors.'" *Id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). Thus, "[i]t is inimical to the purposes of these laws to award damages for the type of injury claimed here." *Id.*; *see also*, *e.g.*, *Cargill*, 479 U.S. at 122 ("[A] showing of loss or damage due merely to increased competition does not constitute [antitrust] injury.").

Pulse does not cite a single case holding that the loss of exclusivity can constitute antitrust injury. Instead, it repeats (at 44) that "courts assessing antitrust standing [must] *assume* that the alleged conduct . . .

is anti-competitive." But assuming that the *overall* course of conduct is anti-competitive does not mean assuming that every *aspect* of that conduct is anti-competitive or that anyone affected by that conduct has antitrust standing. The Supreme Court rejected that argument in *Atlantic Richfield*—a case that Pulse fails to mention—which explained that conduct that violates the antitrust laws may "reduce competition" in some respects even as it "increase[s] competition" in other respects, and that those effects are "often interwoven." 495 U.S. at 344.

To show antitrust standing, Pulse must show that its "loss stems from a competition-*reducing* aspect or effect of" PAVD. *Atl. Richfield*, 495 U.S. at 344; *see also Doctor's Hosp.*, 123 F.3d at 305 ("[A]ntitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition."). Visa's argument here is not "that the PAVD mandate is not illegal because it is pro-competitive," Pulse Br. 44, but that Pulse's asserted injuries flow only from PAVD's pro-competitive (or competition-increasing) effect *on Pulse*.

Pulse also says (at 44) that "tying claims . . . often involve injecting another 'competitor,' *i.e.*, injecting someone with a monopoly in one market into another."  Again, Pulse cites no authority for that proposition—and certainly no authority that labeling something a tie can transform the loss of exclusivity into antitrust injury.[3]

Implicitly acknowledging that the loss of exclusivity is not antitrust injury, Pulse ends (at 44–45) with the convoluted argument that Visa supposedly "forced itself into the ring" and then used the PAVD fees that it allegedly "coerced from issuers" to fund discounts to merchants with which Pulse must compete.  But that is just another way of saying that the pro-competitive effects of PAVD on Pulse are interwoven with its alleged anti-competitive effects on issuers.  It does not change the fundamental flaw in Pulse's argument for antitrust standing to challenge

---

[3] Pulse also mentions in passing (at 43–44) that PAVD supposedly allows Visa to maintain higher signature-authenticated transaction fees.  Even if that were true, it would go to harm to competition, not antitrust injury.  Pulse does not attempt to argue that higher signature-authenticated transaction fees could harm it.  And in the district court, Visa showed that the opposite is the case ███████████████ ███████████████████████████████.  ROA.3272–73. ███████████████████████████████████████. ROA.3270–71.  In fact, when Visa lowered its signature fees in 2012, ███████████████████ ████████████████████████████████████████████████████████████████. ROA.3271.  This dynamic is exactly why rivals are not generally allowed to challenge the higher prices of a competitor.  *See Matsushita*, 475 U.S. at 582–83.

PAVD, because it is precisely the *pro*-competitive effects of increased choice for merchants, lower fees to merchants (from both Visa and Pulse), and increased competition that injures Pulse (if at all).

In *Doctor's Hospital*, this Court recognized the importance of determining—as part of the antitrust-injury analysis—whether a plaintiff's remedy would serve the purposes of antitrust law in lowering prices, increasing competition, and expanding choice.  123 F.3d at 306.  Eliminating PAVD would seriously undermine those fundamental purposes of antitrust law.

### C. Visa's FANF Fee Structure Caused Pulse To Compete By Lowering Per-Transaction Fees.

Pulse contends (at 39–40) that the FANF fee structure—which includes a fixed per-location fee along with lower per-transaction fees—is anti-competitive and injures merchants because FANF allegedly "increases network fees for merchants" in a way that Pulse cannot "undercut."  But Pulse does not pay the FANF.  Rather, Pulse asserts that it is injured by the FANF fee structure because Visa's lower per-transaction fees cause merchants to route to Visa, instead of Pulse, thereby giving Pulse the choice either to lose transaction volume and associated revenues or to cut its own per-transaction fees to compete.

That is not antitrust injury. As with PAVD, Pulse's own brief concedes the crucial, undisputed fact that entitles Visa to summary judgment: If Visa had simply "lowered its per-transaction fees," then "Pulse would have welcomed the opportunity to compete on price." Pulse Br. 41. Pulse does not contend that Visa's lowered per-transaction fees are predatory. And injuries that flow from non-predatory price cuts are not antitrust injuries. "Low[er] prices benefit consumers *regardless of how those prices are set*." *Atl. Richfield*, 495 U.S. at 340 (emphasis added).

The Supreme Court has explained that "price cutting [is] aimed simply at increasing market share, [while] predatory pricing has as its aim the elimination of competition. Predatory pricing is thus a practice 'inimical to the purposes of [the antitrust] laws,' and one capable of inflicting antitrust injury." *Cargill*, 479 U.S. at 118 (last alteration in original) (quoting *Brunswick*, 429 U.S. at 488).

By contrast, "[w]hen prices are not predatory, any losses flowing from them cannot be said to stem from an *anticompetitive* aspect of the defendant's conduct." *Atl. Richfield*, 495 U.S. at 340–41. "[A]ntitrust law welcomes those lower prices for consumers" even if they result from a

rival's strategies that cause its competitors to "hav[e] a tougher time selling." *Felder's Collision Parts, Inc. v. All Star Advert. Agency, Inc.*, 777 F.3d 756, 764 (5th Cir. 2015). Thus, there is no antitrust injury when a defendant's pricing strategy causes a rival "to lower its prices" and "suffer a loss in profitability." *Cargill*, 479 U.S. at 114–16.

Pulse cannot avoid this fundamental principle of antitrust law by relying on purported injuries to *other* market participants. To Pulse (at 40), separating the fixed up-front FANF fee (which supposedly increases prices to merchants) from the lower per-transaction fees (which assertedly injure Pulse) is a "facile framing" that "blinks reality." Pulse insists (at 40–41) that Visa's FANF fee structure must instead be analyzed as a single, integrated fee structure that results in higher overall fees to merchants at the same time it harms Pulse. Once again, that argument is foreclosed by controlling Supreme Court precedent that Pulse fails to mention.

Time and again, the Supreme Court has "reaffirmed that injury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny." *Atl. Richfield*, 495 U.S. at 334. In

*Atlantic Richfield*, the defendant oil company allegedly engaged in a vertical price-fixing scheme by encouraging its dealers to match gasoline prices offered by independent retailers. 495 U.S. at 331–32. Even though that scheme was a *per se* antitrust violation that was expressly designed to harm the independents by depriving them of market share, the Supreme Court held that the independents had not suffered any antitrust injury from non-predatory price competition. *Id.* at 335–45.

"Antitrust injury does not arise"—even in the context of a *per se* antitrust violation—"until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct; in the context of pricing practices, *only* predatory pricing has the requisite anti-competitive effect." *Atl. Richfield*, 495 U.S. at 339 (last emphasis added) (citation omitted). Although the anti-competitive and pro-competitive effects of an alleged antitrust violation are "often interwoven," they *must* be separated to determine whether a particular plaintiff has suffered antitrust injury. *Id.* at 344.

Under this binding precedent, Pulse cannot possibly show antitrust injury from the FANF fee structure. Even assuming that the FANF fee structure increases overall fees to *merchants* (an assumption that Visa

will dispute in litigation brought by merchants), Pulse does not pay those fees and does not suffer any injury as a result of them. *See Matsushita*, 475 U.S. at 582–83; *see also* ROA.1193 (Pulse is "not complaining about the [FANF] fee standing alone"). Rather, the FANF fee structure assertedly injures Pulse only because it █████████████████████ ███████████████████████████ ROA.4767, and ████████████ ████████████████████████████████████████████████ ████████████████████████████████ ROA.4715.

As Pulse's economist Jerry Hausman put it, ████████████████ ████████████████████████████████████████████████ ██████████████████ ROA.4995 (emphasis added). Because Pulse's asserted injury results from having to compete with Visa's lower per-transaction fees, it is not antitrust injury. *See Cargill*, 479 U.S. at 116. "[T]he antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws." *Id.*

That Pulse's injuries from the "FANF price structure" are not antitrust injuries flowing from the supposedly anti-competitive aspect of Visa's conduct becomes self-evident by considering what would have

happened if Visa had simply adopted the allegedly anti-competitive fixed-per-location fee *without* lowering its per-transaction fees. Under Pulse's theory, merchants would be even worse off, as there would be no per-transaction reductions to offset the fixed fee. But Pulse itself would suffer *no injury at all*—even though (accepting Pulse's view) Visa would be making more money and merchants would be paying more money.

Likewise, if Visa had adopted only the lower per-transaction fees, under Pulse's theory, merchants would be better off, Visa would make less money, and Pulse would be injured just *as it is today*. Like the bowling alleys' injuries in *Brunswick*, Pulse's injuries from FANF would remain the same absent any of the supposedly anti-competitive effects of FANF. 429 U.S. at 487–88. And just as in *Brunswick*, Pulse's claimed injuries from the FANF fee structure are caused by "increased, not decreased, competition." *Doctor's Hosp.*, 123 F.3d at 305 n.7 (citing *Brunswick*, 429 U.S. at 479–80). Those injuries are not antitrust injuries.

## D. Pulse's Lack Of Success With Pulse Pay Express Is Neither Antitrust Injury Nor Injury-In-Fact Attributable To Visa's Conduct.

Pulse's final theory of antitrust injury (at 45–47) is that Visa's conduct prevented Pulse from successfully marketing a new "PINless"

product—Pulse Pay Express—to compete for the routing of transactions that were historically processed over Visa's "signature" network. But again, Pulse's own concessions doom that theory.

"For Pulse Pay Express to succeed," Pulse asserts (at 33), "merchants and issuers must enable and invest in technology that allows them to process PINless transactions" over a network that historically processed PIN-authenticated transactions. Pulse contends (at 34) that when it attempted to launch Pulse Pay Express in 2015, it lacked the "'scale and relevance . . . necessary to convince Pulse's issuers and acquirers to invest in'" its "'new product[ ].'" (omission in original) (quoting ROA.4966–67). Pulse's attempt to pin those difficulties on Visa fails for three reasons.

*First*, to the extent Pulse lacked scale and relevance because PAVD and the FANF fee structure caused it to compete for transaction volume and lower its own fees, its injury is not antitrust injury. *Second*, although Pulse also blames Visa's volume agreements for its troubles, it has never articulated a coherent and cognizable theory of how those price-cutting agreements violate the antitrust laws, and thus cannot carry its burden of linking its asserted injury to some anti-competitive aspect of those

agreements. *Third*, even if Pulse's lack of success in launching Pulse Pay Express were antitrust injury, that injury was caused by ███████ ████████ decision to drop Pulse for ██████████, not Visa's conduct.

1. Here and in the district court, Pulse ties its lack of success with Pulse Pay Express to a loss of PIN-authenticated transaction volume resulting from PAVD and the FANF fee structure. *See* Pulse Br. 34, 45–46 (faulting "the FANF structure" for supposedly "discouraging or preventing merchants from investing in Pulse's" PINless products); ROA.4716; ROA.4722. As already demonstrated, *supra* 31–43, those volume losses are not antitrust injury, but rather injury from competition—and it necessarily follows that the lack of PINless success that supposedly flowed from those losses is also injury from competition, not antitrust injury. *See Brunswick*, 429 U.S. at 489.

2. In cursory fashion, Pulse describes (at 45–47) Visa's volume-based discounts with merchants, acquirers, and issuers as an additional reason for its lack of success with Pulse Pay Express. According to Pulse (at 45), the agreements used price cutting to "discourag[e]" customers from picking Pulse Pay Express over Visa Debit. Beyond these general complaints that Visa's incentives encouraged customers to stick with

Visa Debit, Pulse has never "defined the alleged violation with sufficient clarity" in its briefs here or below to enable this Court to determine whether "the claimed injury was either caused by the violation *or* constituted antitrust injury."  Areeda ¶ 335f, at 91 (emphasis added).

Without that clarity, Pulse cannot show that it satisfies the Supreme Court's test for antitrust injury—whether Pulse's alleged injury "occur[red] 'by reason of' that which made the [agreements] unlawful." *Brunswick*, 429 U.S. at 488.  Inserting the word "plainly" and repeating the mantra that an (unspecified) antitrust violation must be assumed (at 47) is no substitute for articulating how a lack of success for Pulse Pay Express passes this test.

During a hearing before the district court, Pulse's counsel at one point suggested that agreements in which Visa provided volume-based discounts were unlawful because they were part of "the entire package" of reduced fees funded by Visa's FANF.  ROA.1342.  Pulse has never repeated this theory in its briefs, as doing so would make crystal clear that the asserted injuries to Pulse Pay Express supposedly flowing from those agreements are no more antitrust injury than any of the other

injuries supposedly caused by the lower per-transaction fees that accompanied the FANF. *See supra* 38–43.

In a footnote, Pulse says (at 46 n.6) that the agreements are the sort of "exclusive-dealing or quasi-exclusive-dealing agreements" that "can be unlawfully anti-competitive when entered into by a monopolist." It is true, as the Supreme Court has explained, that exclusive-dealing contracts *may* violate the antitrust laws *if* the competition they foreclose constitutes a substantial share of the relevant market. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327–28 (1961).

But Pulse has not explained how Visa's volume discounts foreclosed any portion of the alleged debit-network market (except in the sense that "virtually *every* contract to buy 'forecloses' or 'excludes' alternative sellers from *some* portion of the market, namely the portion consisting of what was bought." *Barry Wright Corp. v. ITT Grinnel Corp.*, 724 F.2d 227, 236 (1st Cir. 1983) (Breyer, J.)). That a rival loses business because an agreement creates "a powerful economic incentive . . . to stick to [the]

bargain" is not "exclusionary" under antitrust law and cannot cause antitrust injury to the rival. *Id.* at 238.[4]

That Visa chose to create incentives to stay with Visa Debit in the form of volume-based fee reductions—and thereby supposedly cost Pulse some of the business it had hoped to win through Pulse Pay Express—is not antitrust injury. "[C]utting prices in order to increase business often is the very essence of competition," and "mistaken inferences" condemning price cuts "are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Matsushita*, 475 U.S. at 594.

Volume-discount agreements are therefore generally legal under the antitrust laws. *Fedway Assocs. v. U.S. Treasury, Inc.*, 976 F.2d 1416,

---

[4] Nor has Pulse ever alleged that Visa's volume agreements had attributes that courts have found capable of excluding competition. ROA.174–76. It contends (at 45–46) that Visa "condition[ed] rebates" on reaching "volume targets" and "provide[d] incentives" to reach "volume thresholds," while offering no authority in support of such a watered-down conception of exclusion. In fact, Visa's merchant and acquirer agreements indisputably were *not* capable of excluding competition— ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ROA.3250–51. ▉▉▉▉▉▉▉▉▉▉▉▉▉. Thus, the agreements permitted merchants and acquirers to switch at virtually any time to other networks to take advantage of better offers. ▉▉▉▉▉▉ did exactly that, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉ ROA.8560. Likewise, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉, terminated its agreement with Visa to take a better offer from ▉▉. ROA.3254.

1418 (D.C. Cir. 1992). Antitrust laws "leave unhampered pricing practices that *might* benefit consumers, absent the *clearest* showing that an injury to the competitive process will result." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 902 (9th Cir. 2008) (emphases added).

3.     Even if Pulse could show antitrust injury, it has not shown injury-in-fact relating to Pulse Pay Express—and the Court may affirm on this alternative, independent basis. *See* ROA.8559. Pulse's own arguments and evidence submitted to the district court conclusively establish that competitive obstacles unrelated to Visa's challenged conduct made it ▮▮▮▮▮▮▮▮▮▮ for Pulse to succeed when it launched Pulse Pay Express. ROA.4785.

Injury-in-fact, for antitrust standing purposes, must be "proximately caused" by the allegedly anti-competitive aspect of the defendant's conduct. *Doctor's Hosp.*, 123 F.3d at 305. To make that showing, nascent competitors must demonstrate "'(1) an intention to enter the business, *and* (2) a showing of preparedness to enter the business.'" *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015) (emphasis added) (quoting *Hayes v. Solomon*, 597 F.2d 958, 973 (5th Cir. 1979)). There is no standing where a plaintiff's "insufficient

preparedness . . . flowed from obstacles unrelated to the alleged anti-competitive conduct." *Id.* at 740.

Pulse told the district court that it suffered a ███████████ of volume in its traditional PIN-authenticated business sometime between ████ and ████. ROA.4785, 4942. And it said that this ██████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████ ROA.4705, 4785, 4941–42, 4966–68. In Pulse's words, the █████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████. ROA.4716–17, 4966–67; *see also* ROA.4785 (███████████████████████████████████████████████████████ ███████████████); *cf. Jayco Sys., Inc. v. Savin Bus. Machs. Corp.*, 777 F.2d 306, 313–16 (5th Cir. 1985) (mere possibility of success is not enough for antitrust standing).

Conspicuously, however, Pulse never asserted before the district court—nor provided any supporting evidence to show—that *Visa's* conduct *caused* the ████████ decline that supposedly crippled Pulse Pay

Express.  Instead, Pulse and its sworn declarants carefully said only that



ROA.4709 (emphasis added); *see also* ROA.4785 (describing a

) (emphasis added); ROA.4966 (

)

(emphasis added).

Recognizing that correlation does not equal causation—and that mere "coincidence" is not enough to prove proximate cause—Pulse now says (at 35) that its "decreases in market share coincided with *and were caused by* Visa's illegal conduct." (emphasis added).  Pulse never asserted causation in its submissions below.  And nothing in the record supports that conclusory assertion made for the first time on appeal.  *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("a party cannot defeat summary judgment with conclusory allegations" or "unsubstantiated assertions").

Pulse's own declarants refused to say that Visa's conduct caused Pulse's precipitous decline in transaction volume—and for a very good reason. The ███████████████ occurred between the end of ███ and the end of ███—almost three years after Visa implemented its challenged strategies—when Pulse's debit market share dropped ███████████ ████████████. ROA.2406. And why? That was when ██████████████ ██████████████████████████████████████. ROA.954 ("PULSE transaction dollar volume was down 15% year-over-year due to the loss of volume from a large debit issuer."); ROA.4909.

Notably, Pulse's fortunes rebounded with double-digit growth in the following years—not because Visa's debit strategies changed, but because ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████ ROA.4954. That rebound came several years after what Pulse characterizes as the unsuccessful launch of Pulse Pay Express, however. *See* ROA.807 (Pulse Pay Express expanded to "all debit transactions" in October 2014); ROA.4963.

Pulse entirely ignores the intervening event of ███████████ dropping Pulse for ███. Instead, it tries to distract from this undisputed

fact by quibbling (at 35) that Visa relied in the district court on data about transactions across all segments of Pulse's business. Yet the data isolating Pulse's PIN debit transactions tell the same story—a ██████ decline beginning in ████. *See* ROA.2406.[5]

Pulse also quotes a Pulse executive (at 36) ████████████████

███████████████████████████████████

██████████████████████████████. (citing ROA.5024–25).

███████████████████████████████████

████████████████████████████████████, that is a textbook injury from *competition*—i.e., losing business because a customer chooses a different supplier.

In all events, those anecdotes do not come close to establishing a genuine dispute about whether some anti-competitive aspect of Visa's debit strategies was responsible for the industry's lackluster response to the launch of Pulse Pay Express—especially given that the undisputed

---

[5] Pulse's own market estimates show that its share of debit-network transactions dropped only ███████████████████████████████ hardly a decline. ROA.2406. Indeed, Pulse's share ███████████████ by the end of the year (████) in which Visa's post-Durbin Amendment strategies went into effect. ROA.2406. That alone is enough to doom causation—and explains why Pulse starts (at 35) with its ████ share peak, rather than the lower ████ baseline.

record conclusively establishes that the ███████ decline that (Pulse says) hampered Pulse Pay Express was caused by the intervening event of ████████████ dropping Pulse for ████. *See* Areeda ¶ 338a, at 123 ("[W]hen other forces overwhelm the alleged violation in explaining the plaintiff's situation, then the violation would not be a significant, substantial, or material cause.").

████████████████████—not Visa—made it ████████████ for Pulse Pay Express to succeed because Pulse lacked both the ████████████████████████████████████████████ ████████ Those "obstacles"—which are "unrelated to the alleged anti-competitive conduct"—prevent Pulse from showing antitrust standing based on its lack of success with Pulse Pay Express. *Sanger*, 802 F.3d at 740; *see also Jayco Sys.*, 777 F.2d at 313–16.

\* \* \*

"Because a competitor opposes efficient, aggressive, and legitimate competition by its rivals, it has an incentive to use an antitrust suit to delay their operations or to induce them to moderate their competition." Areeda ¶ 348a, at 231–32. If adopted by this Court, Pulse's theory of antitrust standing would work a radical change in antitrust law by

eviscerating the antitrust-injury requirement, incentivizing competitors to use antitrust litigation as a business strategy (as Pulse and Discover have frequently done), and permitting competitors to seek treble damages based on pro-competitive aspects of their competitors' behavior—all to the ultimate detriment of consumers.

As in *Atlantic Richfield*, there is no reason "to dilute the antitrust injury requirement here" just because a competitor complains that it suffered injury as a direct result of a rival's allegedly anti-competitive conduct. 495 U.S. at 345. Other market participants "may bring suit." *Id.* "That a superior challenger exists is not merely theoretical" in this case. ROA.8561. "Merchants"—who make up the bulk of Pulse's *amici*— "have, in fact, filed suit against Visa" and their "lawsuits include complaints about the FANF and PAVD programs." ROA.8561. In the absence of any reason—much less a compelling one—to dilute the antitrust-injury requirement, summary judgment should be affirmed.

## II. Reassignment Is Unnecessary.

Perhaps to distract from the weakness of its position on antitrust standing, Pulse attacks the district court and demands that this case be reassigned to another district judge on remand. Not so fast. In the first

place, summary judgment should be affirmed—obviating the need for remand.  Regardless, Pulse's request should be denied.

To begin, while Pulse contends (at 52) that the district court "openly embraced Visa's view of the merits," the court had no difficulty putting aside that alleged view when it denied Visa's motion to dismiss. ROA.318.  Half of the remarks about which Pulse complains were made in hearings that took place *before* the court ruled that Pulse's complaint stated a viable claim.  *See* ROA.1117–18, 1125–26, 1472, 1495, 1501–03. The court's demonstrated ability to rule in Pulse's favor after supposedly "openly disparag[ing]" Pulse's case (at 51) strongly suggests that the court's statements reflect nothing more than an effort to test the strength of Pulse's claims and to understand its case.  *See*, *e.g.*, ROA.1588 ("It looks to me like Visa has an integrated deal. . . .  I need the hard data as best we can get it that colors the accusations, and then I'll curl up with Professor Areeda and see if I can—he will shed light on me, so I can shed light on this problem.")

Pulse also says (at 53) that the district court expressed "general disdain for antitrust law and antitrust plaintiffs."  If so, Pulse's trial counsel shared those sentiments—he agreed that "there are more bad

antitrust cases than any other single category, from an economic perspective." ROA.1125 ("Mr. Pratt: I agree with that, Your Honor.").

And the district court was far from the first to question aspects of *Standard Oil* or the Supreme Court's other early antitrust precedents. The Supreme Court itself has noted that its early cases were decided when it "had little experience with antitrust analysis." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 901 (2007) (overruling *Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 378 (1911)).[6] None of the district court's musings suggests that the district court is unable or unwilling to apply binding precedent.

---

[6] *See also*, *e.g.*, *Flood v. Kuhn*, 407 U.S. 258, 286 (1972) (Douglas, J., dissenting) (describing *Federal Baseball Club v. National League*, 259 U.S. 200 (1922), as "a derelict in the stream of the law" resulting from "a narrow, parochial view of commerce"); *United States v. Anthem, Inc.*, 855 F.3d 345, 378–79 (D.C. Cir. 2017) (Kavanaugh, J.) ("As one hornbook aptly puts it, the 'truly important point is that no modern observer, and no modern court, espouses the old *FTC v. Procter & Gamble Co.* (1967) position that efficiencies might be reason to condemn a merger.'") (citation omitted); Robert H. Bork, *Antitrust and Monopoly: The Goals of Antitrust Policy*, 57 Am. Econ. Rev. 242, 242 (1967) ("The life of the antitrust law" is "neither logic nor experience but bad economics and worse jurisprudence."); Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1, 3 (1984) ("Small wonder that the history of antitrust is filled with decisions that now seem blunders."); George L. Priest, *Rethinking the Economic Basis of the Standard Oil Refining Monopoly: Dominance Against Competing Cartels*, 85 S. Cal. L. Rev. 499, 501 n.3 (2012) ("At the time of the Supreme Court's opinion in the case, Standard Oil's market share of refined oil was roughly 64 percent, a questionable monopoly.").

Pulse criticizes (at 21–24, 55–56) the district court's discovery management at length—going so far as to request (at 56) an instruction on remand requiring that it be allowed to obtain discovery produced in separate multi-district litigation in the Eastern District of New York. Yet Pulse makes no effort to show that any particular order was a clear abuse of discretion, and thus has abandoned any challenge to those orders by failing to properly raise the issues in its opening brief. *See, e.g.*, *Kohler v. Englade*, 470 F.3d 1104, 1114 (5th Cir. 2006) (issues not properly presented in party's opening brief are forfeited). It takes remarkable chutzpah to strategically forfeit any challenge to a series of orders while at the same time arguing that those orders are so egregious that they warrant reassignment.[7]

Finally, Pulse's complaint (at 3, 55) that this case took years to get past the "threshold" issue of antitrust standing reveals a fundamental misunderstanding of the antitrust-standing inquiry. Litigants "sometimes speak of 'standing,' 'causation,' or 'antitrust injury' as if these

---

[7] That strategic decision also means that those orders "may not be revisited by the district court on remand," *Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011)—even if the case were reassigned. Pulse can be counted on to attempt to revisit those rulings afresh in the event of reassignment, notwithstanding that they are now the law of the case.

are 'threshold' requirements that need only to be pleaded properly to get an antitrust suit started." Areeda ¶ 335e2, at 88. But "it is quite wrong to think of standing, causation, or antitrust injury questions as merely preliminary issues to be forgotten once the court resolves them as best it can early in the suit." *Id.* ¶ 335e2, at 89. "Indeed, the Supreme Court itself has denied a plaintiff's antitrust injury long after a full trial on the merits finding an antitrust violation." *Id.* (citing *Brunswick*, 429 U.S. 477, and *Cargill*, 479 U.S. 104).

In sum, there is no reason to remand this case, because antitrust standing is lacking and summary judgment is proper. But in no event should the Court capitulate to Pulse's demand for reassignment.

## CONCLUSION

The Court should affirm the judgment in favor of Visa.

Dated:  April 5, 2019

Respectfully submitted,

 /s/ *Allyson N. Ho*

Andrew S. Tulumello
Jacob T. Spencer
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539
*atulumello@gibsondunn.com*
*jspencer@gibsondunn.com*

Allyson N. Ho
Bradley G. Hubbard
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas  75201
Telephone:  (214) 698-3100
Facsimile:  (214) 571-2900
*aho@gibsondunn.com*
*bhubbard@gibsondunn.com*

Mark R. Merley
Michael A. Rubin
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, DC  20001
Telephone:  (202) 942-5000
Facsimile:  (202) 942-5999
*mark.merley@arnoldporter.com*
*michael.rubin@arnoldporter.com*

*Counsel for Appellee*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it was prepared in Microsoft Word 2016 using 14-point New Century Schoolbook, a proportionally spaced typeface. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,676 words, excluding the parts exempted under Fed. R. App. P. 32(f) and Fifth Cir. R. 32.2.

*/s/ Allyson N. Ho*
Allyson N. Ho


## CERTIFICATE OF SERVICE

I hereby certify that, on April 5, 2019, a true and correct copy of the foregoing answer was served via the Court's CM/ECF system or via electronic mail on opposing counsel.

*/s/ Allyson N. Ho*
Allyson N. Ho