No. 18-20669

# UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

————————————

PULSE NETWORK, L.L.C.,

*Plaintiff-Appellant*,

v.

VISA, INCORPORATED,

*Defendant-Appellee*.

————————————

On Appeal from the United States District Court
for the Southern District of Texas (Hughes, J.)
No. 4:14-cv-3391

————————————

## REDACTED REPLY BRIEF FOR PLAINTIFF-APPELLANT PULSE NETWORK, L.L.C.

————————————

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

KEVIN M. NEYLAN, JR.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

*Counsel for Plaintiff-Appellant*

May 7, 2019

# CERTIFICATE OF INTERESTED PERSONS

*Pulse Network, LLC v. Visa, Incorporated*, No. 18-20669

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

1. Pulse Network, LLC

2. Discover Financial Services, Inc.

3. Visa, Incorporated

4. Counsel for Pulse Network, LLC: Kirkland & Ellis LLP (Paul D. Clement, Erin E. Murphy, Kevin M. Neylan, Jr., William H. Pratt, Anne M. Sidrys, Michael S. Becker); Beck Redden, LLP (David J. Beck, Geoff A. Gannaway, Russell S. Post); Selendy & Gay, PLLC (Jennifer M. Selendy)

5. Counsel for Visa, Incorporated: Gibson, Dunn & Crutcher LLP (Allyson Ho, Andrew Tulumello, Jacob Spencer); Kwun Bhansali Lazarus, LLP (Asim M. Bhansali); Smyser Kaplan & Veselka, LLP. (Lee Landa Kaplan); Keker, Van Nest & Peters, LLP (John Watkins Keker); Arnold & Porter Kaye Scholer, LLP (Mark R. Merley, Michael Adam Rubin)

s/Paul D. Clement
Paul D. Clement
 *Counsel of Record*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

*Counsel for Plaintiff-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument and believes that oral argument would assist the Court in resolving this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................... iii

TABLE OF AUTHORITIES .................................................................................. v

INTRODUCTION .............................................................................................. 1

ARGUMENT ..................................................................................................... 3

I.     Pulse Has Antitrust Standing ....................................................................... 3

     A.     The FANF Structure Inflicts Antitrust Injury on Pulse ....................... 5

     B.     The PAVD Mandate Inflicts Antitrust Injury on Pulse....................... 13

     C.     Visa's Merchant and Issuer Agreements Inflict Both Injury-In-Fact and Antitrust Injury on Pulse .................................................. 18

II.    This Case Should Be Reassigned On Remand ........................................... 24

CONCLUSION ................................................................................................. 27

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*Albrecht v. Herald Co.*,
    390 U.S. 145 (1968)................................................................8

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990)............................................................8, 9

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982) ............................................... 16, 23, 24

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977).............................................................16

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986).......................................................11, 24

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All. Inc.*,
    123 F.3d 301 (5th Cir. 1997)........................................ *passim*

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992).............................................................1, 2

*FTC v. Motion Picture Advert. Serv. Co.*,
    344 U.S. 392 (1953).............................................................16

*Hornsby Oil Co. v. Champion Spark Plug Co.*,
    714 F.2d 1384 (5th Cir. 1983) ...........................................16

*Int'l Bus. Mach. Corp. v. United States*,
    298 U.S. 131 (1936).............................................................26

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984).................................................................15

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)..............................................................7

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ............................................. 2, 7, 17

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) ...................................................................9

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ........................................................ 16, 20

*U.S. ex rel. Little v. Shell Expl., Prod. Co.*,
    602 F. App'x 959 (5th Cir. 2015) ................................... 25, 27

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ...................................................................7

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ..................................................19

**Other Authority**

Areeda & Hovenkamp, *Antitrust Law* (4th ed.) ..................................... 16, 20

# INTRODUCTION

Congress enacted §2 of the Sherman Act to prohibit "the use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482-83 (1992). Visa has used its monopoly power in the market for debit network services to do all three. Indeed, notwithstanding that it was already an adjudicated antitrust violator, Visa responded to Congress' decision to outlaw Visa's previous anti-competitive conduct and to inject greater competition into the debit network services market by promptly devising a new set of anti-competitive measures designed to thwart Congress' will. As one of the competitors that Visa has used its monopoly power to exclude, Pulse undoubtedly has standing to challenge Visa's anti-competitive practices.

Visa's efforts to prove otherwise are unpersuasive. Visa does not even make a pretense of defending the district court's reasoning. For example, without even acknowledging it is doing so, Visa leaves the court's extraordinary no-injury-in-fact conclusion undefended, raising only a limited and equally frivolous injury-in-fact argument. And Visa has precious little to say in defense of the court's confused antitrust injury analysis. Indeed, for the most part, Visa's arguments have little to do with antitrust injury—*i.e.*, with whether Pulse's alleged injuries are caused by the anti-competitive effects of Visa's conduct—and are really just premature merits

arguments that Visa's conduct is not anti-competitive. Those arguments are wrong in their own right, as meaningful discovery and a trial will prove. But they are beside the point at this stage, for it is settled law that courts must "assum[e] an antitrust violation has occurred" when assessing antitrust standing. *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All. Inc.*, 123 F.3d 301, 306 (5th Cir. 1997).

Visa's arguments also depend on exactly the kinds of "formalistic distinctions" that the Supreme Court has admonished should not distract from "market realities." *Eastman Kodak*, 504 U.S. at 466. Visa tries to avoid the conclusion that its FANF pricing structure harms both merchants and its competitors by ignoring the obvious interrelationship between its fixed upfront fee and its per-transaction fees—even though Visa itself touted that relationship when devising that anti-competitive structure. And while Visa concedes that the debit network services market is a two-sided market, it nonetheless urges this Court to look at only one side of that market when considering the effects of its PAVD mandate on Pulse—even though the Supreme Court rejected that approach just last Term, in a case that Visa remarkably does not even cite in a 60-page brief. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2287-88 (2018). Finally, Visa has so little to say about antitrust injury when it comes to its merchant and issuer agreements that it is forced to resort to a farfetched argument that Pulse does not even have sufficient injury-in-fact to

challenge them—an argument that would require this Court to assume in Visa's favor a host of hotly disputed facts.

Ultimately, Visa fails to refute the conclusion that the decision below is wrong. And it does even less to refute the conclusion that this case should be reassigned on remand. It is not just that Judge Hughes spent "considerable judicial resources ... barking up the wrong tree," *Doctor's Hosp.*, 123 F.3d at 305—although he certainly did, to the point that even Visa has forsaken practically all of his reasoning and nearly two-thirds of his bottom-line conclusions. Beyond mismanaging this case and issuing a cursory and deeply flawed opinion, Judge Hughes has left an indelible impression that Pulse cannot get a fair shake in his courtroom. Accordingly, the best way to ensure that these serious antitrust claims receive their proper day in court is to reassign this case on remand.

## ARGUMENT

### I. Pulse Has Antitrust Standing.

The bar to demonstrate antitrust standing is not particularly high: A plaintiff need show only injury-in-fact to its "business or property," "antitrust injury," and "proper plaintiff status." *Doctor's Hosp.*, 123 F.3d at 305. While the district court concluded (as best one can tell) that Pulse failed to satisfy any of those elements, Visa wisely declines to defend that holding. Visa makes no effort to defend the court's remarkable conclusion that a direct competitor is too "remote[]" to be a

proper plaintiff.  ROA.8561.  Nor does it defend the court's conclusion that Pulse

suffered no injury-in-fact.  ROA.8558-59.  Instead, Visa devotes the vast majority

of its brief to arguing that the injuries Pulse has suffered are not antitrust injuries—

albeit for reasons that differ materially from those advanced by the district court.

Visa's considerably revised arguments cannot rescue the court's cursory and

misguided decision from reversal, for they share the same basic defect:  Visa refuses

to abide by this Court's admonition that anti-competitive effects must be assumed

for purposes of assessing standing.  *Doctor's Hosp.*, 123 F.3d at 306.  To be sure,

Visa's brief pays lip service to that principle.  But its efforts to demonstrate that

Pulse lacks antitrust standing have much less to do with whether Pulse's injuries

flow from the anti-competitive effects of Visa's conduct than with Visa's view that

its conduct is not anti-competitive at all.

Visa is, of course, entitled to that view—at least until a factfinder rejects it.

But who has the better of that argument is indeed a *merits* question for a factfinder

that will need to resolve hotly disputed facts; it is not an antitrust standing question.

At this stage, the challenged conduct must be presumed anti-competitive.  The only

question is whether Pulse's injuries stem from the anti-competitive effects of Visa's

conduct.  They plainly do.  Visa's conduct has inflicted two straightforward

economic injuries on Pulse:  Pulse has lost PIN debit volume and revenue; and Pulse

has been impeded from using its PINless products to compete for transactions

historically processed over signature networks. And those injuries are a product of the anti-competitive effects of Visa's FANF structure, PAVD mandate, and merchant and issuer agreements.

### A. The FANF Structure Inflicts Antitrust Injury on Pulse.

The antitrust problem with Visa's FANF pricing structure is not complex. Visa has used its market power in the credit card network market and its monopoly power in the debit card network market to impose on merchants a pricing structure that they would not voluntarily accept. That pricing structure has classic anti-competitive effects: It forces merchants to pay Visa higher network fees than Visa could command in a competitive market. Those anti-competitive effects must be assumed, *see Doctor's Hosp.*, 123 F.3d at 306, but in all events are confirmed both by the record, *e.g.*, ROA.2632, 4766-67, 4780, 4785-86, 4988, and by basic economics, ROA.4990-4996.

A simplified example helps illustrate the dynamic. Imagine that Visa, Pulse, and other networks are competing to route ten transactions from the same merchant. Knowing that merchants need to accept Visa, Visa is able to exact a fixed upfront fee of $75 and then charges a $5 fee per transaction. Meanwhile, Pulse and the other networks offer to charge $10 per transaction, which barely covers their costs. Visa's deal is clearly inferior—it costs the merchant a supra-competitive $125 to route all ten transactions, whereas Pulse and the other networks would charge a competitive

price of $100 for the same ten transactions. If the merchant had a genuine choice between Visa's combined fixed upfront fee and lower per-transaction fee versus a competitor's higher per-transaction fee, it undoubtedly would pick the latter. But if the merchant cannot avoid paying the $75 upfront fee to Visa, then its only viable choice is to route every transaction through Visa, because $125 is far less than the unavoidable $75 upfront fee to Visa, plus $100 in per-transaction fees to the non-Visa network. So even though Visa is charging more than its rivals, by extracting much of its charges through an upfront fee that merchants cannot avoid and competitors cannot match, Visa undermines competition while providing the illusion of lower fees.

That is the core problem with the FANF structure. Visa uses its market power and monopoly power to force merchants to pay the fixed upfront fee. Visa then uses the revenues generated by that unavoidable upfront fee to artificially lower per-transaction fees to effectively foreclose its rivals from competing, secure in the knowledge that rivals cannot effectively copy its pricing structure because they lack the market and monopoly power to force merchants to pay a significant fixed upfront fee. The integrated two-step nature of the FANF structure is the key to its success.

Visa essentially concedes that merchants have antitrust standing to challenge the FANF structure, but it nonetheless resists the conclusion that Pulse has standing. But the FANF structure injures merchants and competitors through exactly the same

exclusionary conduct. It ensures that merchants will route their transactions to Visa even when Pulse and other competitors are charging lower overall fees. That is a straightforward antitrust violation, and it imposes on Pulse a straightforward antitrust injury: Pulse loses transaction volume and market share because of "the allegedly exclusionary conduct by its competitor." *Doctor's Hosp.*, 123 F.3d at 306.

Visa's attempts to avoid that commonsense conclusion fall flat. Visa asks this Court to ignore the integrated two-step nature of the FANF scheme and focus exclusively on the fact that Visa's per-transaction prices are lower. Visa.Br.38-40. But the fixed fee extracted through its market and monopoly power is precisely what allows Visa to charge artificially low per-transaction prices. And as the Supreme Court has admonished time and again, modes of analysis "'that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.'" *Am. Express*, 138 S. Ct. at 2285. Instead, courts must ensure that their antitrust analysis "meet[s] the dynamics of present economic conditions," *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 899 (2007), and "reflects commercial realities," *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966). Moreover, "antitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace." *Doctor's Hosp.*, 123 F.3d at 305.

Here, Visa's fixed fees and per-transaction fees are two components of a single integrated price structure that raises overall prices for merchants while artificially deflating Visa's per-transaction charges, where Visa faces direct competition from Pulse and others. From Pulse's perspective (and from the perspective of every other market participant), the FANF structure's effect on competition comes from the combined effect of its interrelated components, *i.e.*, the upfront payment that Visa can extract only because it has market and monopoly power, and the per-transaction fees where debit networks compete for merchant routing. Indeed, Visa itself has acknowledged that the two are intertwined, explaining that it is able to charge lower per-transaction fees only because the fixed upfront fee (which it uses its market power to impose) allows it to ███████████ ██████████████████████████████████ In all events, at a bare minimum, whether the FANF is an integrated pricing structure is a disputed issue of fact that must be assumed in Pulse's favor at this stage.

Nothing in *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990), supports Visa's attempt to break its unified pricing structure up into artificial bits and pieces. In fact, *Atlantic Richfield* is inapposite and has been at least partially overtaken by subsequent events, as that case largely reflects the discomfort with its vertical maximum-price precedent that ultimately led the Supreme Court to overrule *Albrecht v. Herald Co.*, 390 U.S. 145 (1968), in *State Oil Co. v. Khan*, 522 U.S. 3,

7 (1997). The plaintiff in *Atlantic Richfield* originally attempted to bring both a §1 vertical maximum price-fixing claim based on *Albrecht* and a §2 predatory pricing claim, but dropped its §2 predatory price-fixing claim (presumably because it could not show market power). Despite dropping its §2 claim, the plaintiff convinced the Ninth Circuit that it could pursue its *Albrecht* claim without showing that the allegedly anti-competitive vertical maximum price-fixing agreement involved any predatory pricing.

The Supreme Court rejected that gambit, explaining that, without predatory pricing, the anti-competitive conduct prohibited by *Albrecht*—namely, a wholesaler setting maximum prices so low for its downstream retailers that they could not effectively compete—would actually *benefit* the retailers' competitors. *Atl. Richfield*, 495 U.S. at 336-37. Because the plaintiff in *Atlantic Richfield* was just such a competitor, it stood only to benefit from what made the vertical constraint anti-competitive vis-à-vis the Atlantic Richfield retail stations. Thus, *Atlantic Richfield* is a classic case where the antitrust plaintiff's injuries had nothing to do with what made the assailed conduct anti-competitive. And that case has nothing to do with this case, which involves claims that what makes Visa's conduct anti-competitive is precisely what injures Pulse and other PIN networks, as it impairs their ability to compete.

Visa nonetheless reads *Atlantic Richfield* as establishing a rule that low prices can be challenged only if they are predatory. Visa.Br.41. That argument suffers from multiple flaws. First, as explained, *Atlantic Richfield* rejected an effort to use a vertical price-fixing scheme that could only have benefitted the retail-level competitor to avoid the need to plead market power and the other elements of a valid predatory-pricing claim. It did not purport to lay down a categorical rule that every challenged practice that manifests itself in apparently "low prices" must be pled as a predatory pricing claim. Second, and more important, Pulse's complaint is not that Visa's pricing is anti-competitively *low*. Pulse's complaint is precisely the opposite: Visa uses its market and monopoly power to extract an upfront payment that allows it to charge supra-competitive prices. To be sure, part of Visa's scheme is to use the upfront fee to artificially lower the per-transaction charges as to which it faces direct competition. But that is just a manifestation of an integrated strategy of using market and monopoly power to charge supra-competitive prices.

Indeed, Visa's conduct is actually far more pernicious—and far more sustainable—than a typical predatory pricing scheme. A typical predatory pricing scheme depends on the monopolist's ability to recoup losses from temporarily below-cost prices by raising prices *after* it has driven competitors from the market, but *before* the newly raised prices attract new competitors. Courts are leery of predatory pricing claims because they have pro-competitive benefits in the short run

and any harms are difficult to sustain in the long run. Visa's FANF scheme, by contrast, never lowers total prices (upfront plus per-transaction) and is infinitely sustainable because the upfront fee (extracted through market and monopoly power) more than pays for the artificially low per-transaction fees. There is no need to "recoup" actual below-cost pricing. Thus, unlike a predatory pricing scheme, the FANF structure harms consumers and competitors in the short run and is sustainable in the long run. Finally, to the extent Visa is complaining that Pulse should have to plead a different theory or include additional predatory-pricing-like allegations, that is a merits argument that has nothing to do with antitrust injury.

Visa next makes the puzzling argument that Pulse cannot complain about the FANF structure "[e]ven assuming" (as the evidence will prove) that it "increases overall fees to *merchants*" because Pulse "does not pay those fees." Visa.Br.41-42. Of course, Pulse has never suggested that it is injured by paying merchant fees, for the rather obvious reason that it does not pay them. Pulse is injured because the FANF structure causes it to lose business from merchants, through Visa's use of its market power to sustain higher overall pricing while using lower per-transaction fees to win merchant business. That is the very definition of antitrust injury to a competitor. The fact that merchants suffer as well just makes the FANF structure "a practice that harms both competitors *and* competition." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 117-18 (1986).

Visa closes with two hypotheticals that it insists prove that "Pulse's injuries from the 'FANF price structure' are not antitrust injuries flowing from the supposedly anti-competitive aspect of Visa's conduct." Visa.Br.42. In fact, each just reveals how Visa's refusal to treat its fixed fee and its per-transaction fees as an integrated pricing structure distorts the analysis. Visa first posits a world in which it "had simply adopted the allegedly anti-competitive fixed-per-location fee *without* lowering its per-transaction fees." Visa.Br.42-43. In that world, Visa says, "merchants would be even worse off, as there would be no per-transaction reductions to offset the fixed fee. But Pulse itself would suffer *no injury at all*." Visa.Br.43. To the extent the latter is true, it is only because, in that world, Visa would not have set the terms of its integrated pricing structure to be truly integrated or to undercut its rivals. Of course, there is a reason that is a hypothetical: In the real world, Visa was not interested in extracting an upfront fee that was unrelated to its per-transaction pricing. Instead, Visa recognized that an integrated pricing structure would allow it to simultaneously extract upfront fees *and* win routing decisions by artificially deflating its per-transaction prices. Simply pointing to a less integrated and less anti-competitive pricing structure hardly helps Visa defend its actual practices.

The second hypothetical suffers from the same basic problem. Visa posits a world in which it "had adopted only the lower per-transaction fees," in which case,

Visa says, "Pulse would be injured just *as it is today*." Visa.Br.43. Not so. For antitrust purposes, Pulse would emphatically *not* be injured "just as it is today"—because in that hypothetical, Pulse would be losing business because Visa offered a *lower* price for the same product. That scenario would prompt a question of whether Visa's lower prices were a product of greater efficiencies or a predatory pricing scheme. But as explained, the problem here is that the pricing scheme is integrated and results in higher, not lower, prices, which in turn makes the anti-competitive scheme enduring. Hypotheticals that ignore one half or the other of the integrated pricing scheme at the heart of the FANF structure just underscore that Visa's scheme is distinctly anti-competitive in ways that harm both Visa's competitors and customers. *See* Merchant Advisory Grp. Amicus.Br.21-24.

## B. The PAVD Mandate Inflicts Antitrust Injury on Pulse.

As the FANF structure is to merchants, the PAVD mandate is to issuers: a condition that they would not accept if Visa did not have monopoly power. The PAVD mandate injures issuers by causing them to pay Visa higher fees—fees that they would not pay if Visa did not use its monopoly power to force them to enable PAVD. ROA.4769-4770, 4780, 4787; *Doctor's Hosp.*, 123 F.3d at 306. And issuers are injured precisely because Visa's competitors are injured: The PAVD mandate causes Pulse to lose market share and transaction volume even though it charges

issuers lower prices, and impedes Pulse's ability to make inroads on Visa's signature debit transaction business through either its PIN product or its PINless products.

Once again, Pulse's injuries are directly attributable to "the allegedly exclusionary conduct by its competitor." *Doctor's Hosp*., 123 F.3d at 306. The PAVD mandate's exclusionary effects are, if anything, even starker than those of the FANF structure. The PAVD mandate restricts competition in the most basic way imaginable: by eliminating a competitive alternative to Visa's products from the issuer side of the market. Given the choice, some issuers would prefer to negotiate an exclusive deal with a non-Visa PIN network—such as Pulse—because a network will often offer better terms in exchange for making it the sole PIN authentication option on a debit card. Moreover, many issuers would prefer not to enable PAVD, because every time a *merchant* routes a transaction over PAVD (which Visa induces merchants to do by charging lower *merchant-side* fees), the *issuer* pays more than it would have had the merchant not used PAVD.

Visa could have tried to induce issuers to *choose* one of its PIN options by offering them a better deal in exchange for enabling PAVD or Interlink along with a second PIN option. But rather than compete, Visa decided to eliminate the competitive threat to its monopoly: The PAVD mandate ties Visa's PIN debit product to its signature debit product, forcing issuers to include PAVD or Interlink on Visa signature debit cards. Issuers thus suffer twice over: first, because they are

deprived of the option of using the promise of exclusivity to negotiate the best deal, and second, because once Visa has forced PAVD onto their cards, it charges them higher issuer fees for the transactions that it induces merchants to route over PAVD. That is a straightforward antitrust violation. "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer ... might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).

Issuers suffer these injuries precisely because the PAVD mandate impedes Pulse's ability to compete. First, Pulse loses the transaction volume on the merchant side that would come from exclusive deals on the issuer side because the PAVD mandate deprives issuers of the option of making exclusive deals with a PIN network. That prevents Pulse from obtaining the volume needed to offer issuers better deals. Second, Pulse loses transaction volume because the PAVD mandate enables Visa to force issuers to pay higher network fees that can then pay for the lower per-transaction fees that it uses to induce merchants to use PAVD. The PAVD mandate therefore directly inhibits Visa's competitors at the expense of issuers. Indeed, there is a straight line from Visa's conduct to the injury to both issuers and

Pulse, making Pulse's injuries classic antitrust injuries. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Blue Shield of Va. v. McCready*, 457 U.S. 465, 483 (1982); *Doctor's Hosp.*, 123 F.3d at 306.

Visa cannot escape that straightforward conclusion. Visa begins by baldly proclaiming that "Pulse's loss of exclusivity cannot constitute antitrust injury." Visa.Br.31; Visa.Br.35-37. Visa tellingly cites no authority for that proposition—because there is none. While exclusivity deals can be anti-competitive when entered into *by a monopolist*, *see infra* Part I.C, exclusivity deals are one way that *non-dominant* firms can compete and "'may well be of economic advantage to buyers as well as to sellers.'" *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 334 (1961); *see also FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 396 (1953) (explaining there can be "compelling business reasons for some exclusive arrangement[s]"); *Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1392 & n.6 (5th Cir. 1983). Indeed, "the procompetitive use of exclusive dealing to facilitate market entry" or expansion by non-dominant firms "where it might not otherwise occur at all" is well recognized. Areeda & Hovenkamp, *Antitrust Law* ¶1811a (4th ed.). That is what makes its competitors' exclusivity deals a powerful threat to Visa: They enable non-dominant networks like Pulse to make inroads on Visa's monopoly.

Visa next asks this Court to excuse its anti-competitive conduct vis-à-vis issuers by focusing on the so-called voluntary choices of merchants. According to Visa, Pulse cannot complain about losing routing decisions to PAVD because merchants choose PAVD on account of Visa's lower merchant fees. Visa.Br.33. Even setting aside the role that the FANF structure and Visa's volume-based discounts play in that "choice," Visa ignores both the fact that *merchants* would not route transactions through PAVD if Visa did not *force issuers' hands* by tying its PIN products to its signature debit cards, and the fact that its merchant fees would not be lower if Visa were not able to recoup the costs of lowering them by charging higher fees to the issuers who are forced to enable its products. ROA.4769-4770, 4787. Visa thus wins merchant-side routing decisions only by impeding issuer-side competition. Visa cannot insulate that anti-competitive conduct from antitrust scrutiny by focusing myopically on one side of a two-sided market. As the Supreme Court held just last Term, a restraint on either side of a two-sided market must be analyzed in terms of its effects on *both* sides of that market. *Am. Express*, 138 S. Ct. at 2287-88.[1]

---

[1] Visa is also wrong to assume that the PAVD mandate must benefit merchants. As explained in Pulse's opening brief, the PAVD mandate also enables Visa to keep its *signature* debit merchant fees artificially high. *See* Pulse.Br.43-44.

Remarkably, while Visa concedes (as it must) that this is a two-sided market, Visa.Br.5, it does not even mention *AmEx*, let alone make any effort to reconcile its argument with that case. Instead, Visa once again invokes *Atlantic Richfield*. Visa.Br.36. But that inapposite case has (if possible) even less relevance to the PAVD claims than to the FANF claims, and certainly provides no basis for ignoring the Supreme Court's far more recent on-point teaching in *AmEx*. To the extent Visa invokes *Atlantic Richfield* for the proposition that Pulse's injury must stem from the anti-competitive aspects of Visa's conduct, rather than from a vertical §1 claim that could only benefit competitors, it is both off-point and readily satisfied. There is no disconnect between what Pulse alleges is anti-competitive and what Pulse alleges causes its injury. To the extent Visa is just arguing that its policies are really not anti-competitive, that is a merits argument that has nothing to do with antitrust standing or injury. Visa's belief that the PAVD mandate is good for competition is wrong on its own terms, but is also irrelevant to the only question here, for courts must "assum[e] an antitrust violation" when assessing antitrust standing. *Doctor's Hosp.*, 123 F.3d at 306. Visa's refusal to abide by that admonition succeeds only in revealing that it does not have a viable argument that Pulse lacks antitrust standing.

### C. Visa's Merchant and Issuer Agreements Inflict Both Injury-In-Fact and Antitrust Injury on Pulse.

Visa's merchant and issuer agreements represent Visa's effort to build a wall around its signature network business and debit network monopoly. These

agreements commit merchants and issuers to routing the bulk of their transactions over Visa Debit, thereby impairing the ability of rival networks to introduce cheaper PINless products like Pulse Pay Express. ROA.4788-4789; *Doctor's Hosp.*, 123 F.3d at 306. Visa's scheme has the same harmful effect as the exclusive dealing arrangements that dominant firms have long tried to use to erect barriers to entry to keep out their rivals.

Again, the mechanics are not complicated. Visa's exclusivity deals "help keep usage of [PINless products] below the critical level necessary for [Pulse] or any other rival to pose a real threat to [Visa's] monopoly." *United States v. Microsoft Corp.*, 253 F.3d 34, 71 (D.C. Cir. 2001) (en banc) (per curiam). That is a prototypical "harm to competition," and it is harm that must be assumed at this stage to lack any "procompetitive justification," rendering these "exclusive contracts ... exclusionary devices, in violation of §2 of the Sherman Act." *Id.* The resulting loss of PINless volume is clearly antitrust injury, as it "flows from [Visa's] exclusionary conduct ... and is exactly the kind of anticompetitive effect [Visa] sought." *Doctor's Hosp.*, 123 F.3d at 306.

Visa's responses are unpersuasive. Visa first complains that Pulse's theory somehow lacks "clarity." Visa.Br.45-46. That is a strange charge. There is nothing novel or unclear about Pulse's theory—in fact, Visa spends several pages responding to it. Visa.Br.47-49. Moreover, Visa's responses are unabashedly merits arguments.

For instance, Visa denies that its "volume discounts foreclosed any portion of the alleged debit-network market," Visa.Br.47; denies that its "volume agreements had attributes that courts have found capable of excluding competition," Visa.Br.48 n.4; and insists that "[v]olume-discount agreements are ... generally legal under the antitrust laws," Visa.Br.48. Those are arguments that Visa's conduct is not anti-competitive, not arguments that there is a mismatch between what causes Pulse's injury and what Pulse assails as anti-competitive.

Those arguments are also in considerable tension with Visa's insistence that *its competitors'* exclusivity-based discounts are somehow per se anti-competitive. *See* Visa.Br.31; Visa.Br.35-37. In fact, Visa has it wrong on both counts, for the law is well settled that exclusive-dealing and volume-based discounts are generally pro-competitive when offered by non-dominant firms, but can have precisely the opposite effect when offered by a monopolist. *See* Areeda ¶1811a; *Tampa Elec.*, 365 U.S. at 334.

Implicitly recognizing that it has no good response on antitrust injury, Visa shifts gears and makes an exceedingly far-fetched argument that the harms Pulse have suffered to its PINless products do not even constitute injury-in-fact. Visa.Br.49-54. Visa first makes the remarkable claim that Pulse never argued that any of Visa's conduct has impeded Pulse's ability to compete for PINless transactions. Visa.Br.50-51. Pulse's summary-judgment briefing (among other

portions of the record) readily refutes that claim. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

Visa next argues that Pulse failed to make inroads with its PINless product not because of Visa's anti-competitive conduct, but because in 2015 ██████ ████████ decided to replace Pulse with ████ on many of its debit cards.  Visa.Br.52-54.  That argument—that Pulse's injuries stemmed from its own failings rather than Visa's exclusive practices—is as far removed from a no-injury-in-fact argument as one can get.  It is a merits argument that assumes that someone caused an injury-in-fact.  And this Court would have to resolve a host of hotly disputed facts in Visa's favor—and to ignore irrefutable facts that contradict Visa's story—to find that the someone is ████████████ not Visa.[2]  As explained in Pulse's opening brief, Pulse.Br.34-36, the record evidence shows that Pulse's debit network share ██████

---

[2] As Visa acknowledges by describing this as an "alternative" basis to affirm, Visa.Br.49, even the district court did not purport to resolve that fact question in Visa's favor.  In fact, the court's antitrust injury analysis simply ignored Pulse's PINless claims.

██████████████████████████████████████████—*i.e.*, soon after Visa's post-Durbin practices went into effect in April 2012, and years before ████ ███████████████████████████████████ Thus, even if ████ ████████████████████████████████████████████ ████████████████████████████████████, there is no way to conclude on this record at the summary-judgment stage that it is the *sole* explanation for ████████████████████████████████████████

Indeed, Visa does not even make that argument, for it conspicuously does *not* defend the district court's implausible conclusion that Pulse has suffered no injury-in-fact *at all*. Instead, Visa appears to be arguing only that while Visa may be responsible for *some* of Pulse's lost PIN volume and market share, it is not responsible for enough of it to be responsible for Pulse's loss of the necessary "scale and relevance" to persuade more merchants and issuers to enable and invest in Pulse's PINless products. Visa.Br.44. In other words, Visa is just arguing that whatever injuries it may have caused Pulse's PIN volume and market share are not substantial enough to have impeded the development of its PINless products. That is not only a misplaced merits argument, but a mistaken one: It assumes that the *only* way that Visa's conduct has impeded Pulse's efforts to compete against Visa's signature business through its PINless product is by depriving Pulse's PIN business of scale and relevance. But while that is certainly an important part of Pulse's injury-

in-fact (as to *all* of Visa's anti-competitive conduct, not just its issuer and merchant agreements), Pulse also has consistently maintained that Visa's conduct—and in particular, its merchant and issuer agreements—has "*directly* impeded Pulse's entry into the market for PINless transactions." Pulse.Br.34 (emphasis added).

Visa's highly attenuated ████████████ theory thus is relevant, at most, only to assessing the damages that can be assigned to Visa—not to assessing Visa's liability, and certainly not to assessing Pulse's standing. And in all events, again, it is a hotly contested (and easily refuted) causation argument that cannot be assumed in Visa's favor on its own motion for summary judgment.

\*     \*     \*

These drawn-out proceedings well illustrate why "standing should not become the tail wagging the dog in 'classical' antitrust cases such as this one by an allegedly excluded competitor." *Doctor's Hosp.*, 123 F.3d at 306. Properly understood, the antitrust-injury inquiry "embrac[es] the general principle that treble-damages recoveries should be linked to the procompetition policy of the antitrust laws." *McCready*, 457 U.S. at 482. That link could hardly be tighter in this case, for the injuries Visa has inflicted on Pulse, and the extent to which Visa has undermined "the procompetition policy of the antitrust laws," are one and the same. This is not a case like *Atlantic Richfield*, where a competitor who cannot allege a valid §2 claim is attempting to substitute complaints about a vertical agreement that did not directly

cause its injuries.  Pulse has challenged multiple Visa practices as anti-competitive §2 violations, and each of the challenged practices "harms both competitors *and* competition"; indeed, each harms competition precisely because it excludes Visa's competitors.  *Cargill*, 479 U.S. at 117-18.  Pulse's "injury 'flows from that which makes defendants' acts unlawful' within the meaning of *Brunswick*, and falls squarely within the area of congressional concern."  *McCready*, 457 U.S. at 484.  Pulse therefore has antitrust standing.

## II.   This Case Should Be Reassigned On Remand.

Pulse's opening brief recounts in detail Judge Hughes' remarkable display of on-the-record hostility toward Pulse's case and antitrust claims in general.  *See* Pulse.Br.19-26, 50-56.  Judge Hughes' disdain manifested not only in demeaning comments from the bench, but in an unreasonable approach to case management that derailed Pulse's effort to build its case at every turn.  Indeed, *four years* of litigation ultimately culminated in a cursory and meandering opinion that does not respect the governing standards, does not apply the governing law, and displays little if any understanding of Pulse's claims.

This case readily satisfies this Court's three-part test for reassignment:  Judge Hughes "would reasonably be expected upon remand to have substantial difficulty in putting out of his ... mind previously-expressed views or findings determined to be erroneous"; reassignment is "advisable to preserve the appearance of justice"; and

reassignment would not "entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *U.S. ex rel. Little v. Shell Expl., Prod. Co.*, 602 F. App'x 959, 975 (5th Cir. 2015) (reassigning case from Hughes, J.). *A fortiori*, this case also satisfies this Court's alternative, more lenient test, under which reassignment is proper "when the facts 'might reasonably cause an objective observer to question [the judge's] impartiality.'" *Id.*

Visa has little to say in defense of Judge Hughes' performance. Its principal defense is that Judge Hughes could not have been unremittingly hostile from the outset because before issuing his fatally flawed summary judgment ruling, he denied Visa's motion to dismiss. *See* Visa.Br.17-18 & n.2, 26, 56. Similarly, while Visa cannot defend most of Judge Hughes' inappropriate comments and actions, it points out that some of the worst of the worst preceded the motion-to-dismiss denial. Visa.Br.56. But Visa conspicuously declines to quote the motion-to-dismiss "opinion" that purportedly displays Judge Hughes' impartiality. It reads, in its entirety: "While the complaint is not compellingly lucid, Pulse Network, LLC, has alleged sufficient facts that probably adequately state a claim for relief." ROA.318. That begrudging sentence is hardly reflective of a serious "effort to test the strength of Pulse's claims and to understand its case." Visa.Br.56. Rather, it evinces hostility to antitrust claims generally and Pulse's claims in particular, and is emblematic of

the lack of serious judicial effort to wrestle with serious antitrust claims that have been *sub judice* for four years and counting.

Visa suggests in passing that Judge Hughes' disdain is a problem of Pulse's counsel's own making, pointing to a single instance reflecting equal parts Stockholm syndrome and an effort to make modest headway with an openly hostile court. Visa.Br.56-57. But Visa tellingly cannot identify any point at which Pulse even tacitly encouraged or acquiesced in Judge Hughes' radical views, *e.g.*, that the "only real monopolies are ones supported by the government," ROA.1495, or that the landmark anti-tying case *International Business Machines Corp. v. United States*, 298 U.S. 131 (1936), was "decided wrongly," ROA.1632. While Visa tries to dismiss these damning comments as "off-the-cuff" "musings," Visa.Br.17-18 n.2, 57, an objective observer would seriously question whether a judge who has openly questioned the entire edifice of modern antitrust law and expressed specific doubt that tying is anti-competitive could impartially resolve claims that a monopolist has violated the Sherman Act by imposing anti-competitive tying arrangements.

Finally, Visa faults Pulse for the excruciatingly slow pace at which this case has progressed because Pulse "asked the district court to defer any decision on the merits of its antitrust claims until after the court decided whether it had antitrust standing." Visa.Br.19-20. Visa yet again tells only half the story: Of course Pulse did not want the court to issue a ruling on the merits when the court had yet to allow

Pulse any meaningful discovery. *See* Pulse.Br.22-23, 55-56. And Visa cannot try to claim that *this* is a problem of Pulse's own making, for Pulse pleaded with the court for discovery at every turn. Visa's argument thus only underscores why, at a bare minimum, this Court should remand with instructions to the district court to allow Pulse to conduct meaningful discovery and to promptly set a trial date.[3] But after four years of "long delays, repeated errors, and cursory reasoning in the district court's opinions to date," *Little*, 602 F. App'x at 976, the far better course is to reassign what could be one of the first cases to wrestle with the Supreme Court's recent and important *AmEx* decision to a judge who will ensure that both the appearance and the actuality of justice are realized.

## CONCLUSION

This Court should reverse and order the case reassigned on remand.

---

[3] Visa suggests in a footnote that Pulse has "forfeited" the right to seek any discovery on remand that the district court has already denied because Pulse did not independently challenge the court's discovery orders. Visa.Br.58 & n.7. But the fact that the court would not give Pulse particular (or, really, much of any) discovery at the *standing* stage does not preclude Pulse from seeking that same discovery and/or any other discovery that may be warranted should this Court remand for resolution on the merits.

Respectfully submitted,

s/Paul D. Clement

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

KEVIN M. NEYLAN, JR.
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

*Counsel for Plaintiff-Appellant*

May 7, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that service will be made on opposing counsel by the CM/ECF system or by electronic mail.

s/Paul D. Clement<br>
Paul D. Clement

**CERTIFICATE OF COMPLIANCE**

I certify:

1) This brief complies with the type-volume limitation Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), it contains 6,494 words as determined by the word counting feature of Microsoft Word 2016.

2) The required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13, the electronic submission is an exact copy of the paper submission, and the document has been scanned for viruses with Windows Defender, last updated May 3, 2019 and is free of viruses.

3) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

s/Paul D. Clement
Paul D. Clement
